# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 1200 | **DATE** | 9/26/2002 |
| **CASE TITLE** | Pamela J. Alper and Michael N. Alper vs. Altheimer & Gray, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 10/10/2002 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendants' motions to strike (Doc. Nos. 281-1 and 281-2) are granted. Defendants' motion for summary judgment (Doc. No. 243-1) is denied in part and granted in part. Plaintiffs' motion for summary judgment (Doc. No. 59-1) is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | SEP 2 7 2002 | |
| | Docketing to mail notices. | | date docketed | 350 |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 9/26/2002 | |
| ETV | courtroom deputy's initials | | date mailed notice | |
| | | | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
SEP 2 7 2002

| | |
|---|---|
| PAMELA J. ALPER and MICHAEL N. ALPER, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| ALTHEIMER & GRAY, an Illinois general partnership, MYRON LIEBERMAN, individually, and ROBERT L. SCHLOSSBERG, individually, | ) ) ) ) ) |
| Defendants. | ) ) |
| ALTHEIMER & GRAY, an Illinois general partnership, MYRON LIEBERMAN, individually, and ROBERT L. SCHLOSSBERG, | ) ) ) ) ) |
| Third-Party Plaintiffs, | ) ) |
| v. | ) ) ) |
| BICKEL & BREWER, a Texas partnership, | ) ) |
| Third-Party Defendant. | ) |

No. 97 C 1200

Judge Rebecca R. Pallmeyer

## MEMORANDUM OPINION AND ORDER

The events giving rise to this legal malpractice action occurred in late 1995 and early 1996, when Plaintiffs Michael and Pamela Alper, husband and wife, negotiated to sell their corporation Terrific Promotions, Inc. ("TPI"), to Dollar Tree Stores, Inc ("DTS"). Defendants Altheimer & Gray, Myron Lieberman, and Robert Schlossberg (collectively "Altheimer") represented the Alpers in the negotiation and drafting of transaction documents signed on January 16, 1996. After the sale closed on January 31, 1996, the Alpers discovered that DTS had bought more of TPI's business than the Alpers claimed they intended to sell, and that DTS had hired valued employees that the Alpers hoped to employ in their own business. When the Alpers reported their dissatisfaction to

Altheimer, an Altheimer lawyer advised them that the agreement, as drafted, did not prohibit DTS's conduct but that the Alpers might have claims against DTS for fraud in the inducement of the contract and under other theories. The Alpers filed suit against DTS and a former employee in Illinois state court but then withdrew that action before filing suit in this court against the same parties. Judge Lindberg dismissed the Alpers' federal securities and antitrust claims with prejudice and declined to exercise supplemental jurisdiction over their state law claims. The Alpers then brought this action but this court dismissed several of their original claims. In the mean time, Altheimer filed a third-party complaint seeking contribution from the Alpers' former attorneys, the law firm of Bickel & Brewer, on the theory that the Alpers' harms derive in part from the firm's handling of their state court litigation.

Currently before this court are cross-motions for summary judgment on the Alpers' only surviving claim: that Altheimer committed professional negligence in its handling of the DTS transaction and its aftermath. Altheimer has also moved to strike the testimony of two of the Alpers' expert witnesses. For the reasons explained below, Plaintiffs' motion for summary judgment is denied, Defendants' motions to strike are granted, and Defendants' summary judgment motion is granted in part and denied in part.

## FACTUAL BACKGROUND[1]

### Parties and Jurisdiction

Plaintiffs Michael N. Alper and Pamela J. Alper are residents of the State of Florida. (Plaintiffs' Supplemental Submission Regarding Subject Matter Jurisdiction of 9/8/00 ("Pls.' SMJ

---

[1] The court has gleaned the facts from the parties' Local Rule 56.1 statements. The court notes that Plaintiffs have not replied to the additional facts that Defendants provided in their 56.1(b) Statement opposing Plaintiffs' Motion for Summary Judgment. Plaintiffs did challenge many of these facts when Defendants provided them in identical form in Defendants' own motion for summary judgment, however. The court will deem admitted those facts that appear exclusively in Defendants' statement of facts in opposition to summary judgment.

Sub."), Doc. No. 230; Driver's License of Michael Neal Alper issued 1/31/96, Ex. B to Pls.' SMJ

Sub.; Voter Registration Card of Michael Neal Alper issued 1/31/96, Ex. C to Pls. SMJ Sub.; Voter

Registration Card of Pamela J. Alper, Ex. D to Pls. SMJ Sub.) Defendant Altheimer & Gray is a

law firm organized as a partnership under Illinois law; none of its partners are Florida residents.

(Defendants' Third Submission Regarding Subject Matter Jurisdiction of 12/30/99 ("Defs.' Third

SMJ Sub."), Doc. No. 165; Table of Principal Residences of Altheimer Partners, Ex. A to Defs.'

Third SMJ Sub.) Defendants Myron Lieberman and Robert L. Schlossberg are attorneys licensed

to practice in Illinois and partners in the firm of Altheimer & Gray. (*Id.*; Ans. ¶¶ 5-6; Defs.' 56.1

Resp. ¶ 3.) Defendants represented the Alpers in the negotiations that concluded in the January

31, 1996 sale of their shares in Terrific Promotions, Inc. ("TPI"), an Illinois corporation, to Dollar

Tree Stores, Inc. ("DTS"). (Ans. ¶¶ 13, 25.)

The court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1)

because the matter is between citizens of different states and the amount in controversy exceeds

$75,000, exclusive of interest and costs. (Ans. ¶ 7.) Venue is proper in this court pursuant to 28

U.S.C. § 1391(a) because events giving rise to the claims asserted in this action occurred in this

judicial district. (Ans. ¶ 9.)

**TPI and Its Key Officers**

Some time between 1982 and 1984, the Alpers formed TPI. (M. Alper Deposition of

3/26/96, Exhibits in Support of Defendants' Motion for Summary Judgment ("DX") 20, at 9; Pamela

Alper ("P. Alper") Deposition of 4/10/96, DX 25, at 13-14.) From the outset, the Alpers owned all

of the stock in TPI. (P. Alper Dep. of 4/10/96, at 33-34; Ans. ¶ 10.) Mr. Alper served as the

president and chief operating officer of TPI; Mrs. Alper served as the chair and chief executive

officer. (M. Alper Dep. of 3/26/96, at 57, 60; P. Alper Dep. of 4/10/96, at 24.) In 1986, TPI opened

its first "Dollar Bill$" retail store, selling retail consumer goods priced mostly at one dollar. (First

3

Amended Verified Complaint of 3/28/96 ("Amended Ver. Compl."), DX 2 ¶ 10; P. Alper Dep. of 4/10/96, at 16, 87-88; M. Alper Deposition of 5/23/00, DX 23, at 769.) TPI grew quickly under the Alpers' management, and by the end of 1995, TPI owned and operated 136 retail stores. (M. Alper Dep. of 3/26/96, at 56; P. Alper Dep. of 4/10/96, at 17.)

In addition to its retail business, TPI also operated a wholesaling business which resold products that TPI had purchased. (Michael Alper Deposition of 4/11/00, DX 21, at 108; Ray Batkiewicz, Chief Financial Officer of TPI, Deposition of 7/11/00, DX 33, at 20.) One of the central issues in this controversy concerns the proper characterization of a diverting business (also known as a "wholesale merchandising business" or "distributing business") that TPI began to operate in 1993.[2] (Ver. Compl. ¶ 12; M. Alper Dep. of 4/11/00, at 120; M. Alper Dep. of 3/26/96, at 63.) Plaintiffs argue that TPI and its predecessors bought and sold merchandise through two major businesses: a retail business and a wholesale business that also performed a diverting function. (Ans. ¶ 10.) Defendants argue that Plaintiffs engaged in three discrete businesses: a retail business, a conventional wholesaling business, and an independent wholesale diverting business. (Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, at 6; M. Alper Dep. of 4/11/00, at 120.) Whether subsumed under the broader category of wholesale business or considered separately, the diverting business was clearly valuable. According to TPI's undisputed financial statements for the fiscal year ending September 30, 1995, TPI's overall business had gross revenues of $113,304,869 with net profits of $4,255,972.[3] (TPI Financial statements, DX 46.) According to an estimate by its CFO, during the same period, TPI's traditional wholesale business had gross revenues of $1,744,389 with net profits of $3,316; and its diverting

---

[2]     The court describes the diverting business more fully below.

[3]     Defendants have submitted what appears to be a draft version of TPI's 1995 financial reports. Plaintiffs have not disputed this document, and in light of the transaction with DTS, it is unclear whether TPI ever obtained a fully audited financial statement for 1995.

4

business had gross revenues of $9,602,956 with net profits of $342,596.[4] (TPI Financial statements, DX 46; Batkiewicz Table of TPI Wholesale and Distributing Income ("Batkiewicz Table"), DX 66.)

As TPI's president and chief operating officer, Mr. Alper was responsible for the diverting business, distribution, real estate, and accounting; he was also involved in retail issues, product mix, and banking relationships. (P. Alper Deposition of 5/25/00, DX 26, at 123; M. Alper Dep. of 3/26/96, at 59.) As TPI's chair and chief executive officer, Mrs. Alper was responsible for (1) administration of both the retail stores and the diverting business; (2) operation of the retail stores; (3) product merchandising and display as well as the establishment of new retail stores; and (4) human resources. (P. Alper Dep. of 5/25/00, at 116-122.)

Ray Batkiewicz is a CPA who served as the chief financial officer of TPI. (Batkiewicz Deposition of 3/29/96, DX 30, at 7, 10-11; Batkiewicz Dep. of 7/11/00, at 34; Batkiewicz Deposition of 7/14/00, DX 34, at 296.) He began working for the Alpers in October 1991 and by 1995 was responsible for supervising TPI's merchandising, and distribution, and accounting (including finance). (*Id.*)

**The Diverting Business**

Robert J. Reynolds, Plaintiffs' grocery industry expert, provided a description of the diverting business, which the court summarizes here. Consumer packaged goods include food items, household supplies, paper goods, health and beauty care items, beverages, and other similar products. (8/27/00 Preliminary Report of Plaintiffs' Expert Robert J. Reynolds ("Reynolds Rep."), grocery industry consultant, DX 40, at 5.) Consumers frequently purchase these items at grocery stores, superdrug stores, mass merchants, and other outlets. (*Id.*) Manufacturers lower wholesale

---

[4]     The parties have not indicated whether Batkiewicz's estimates were used during the negotiations with DTS.

prices in certain geographical areas as part of trade practices carefully crafted to target consumers, meet local competition, enhance local sales volume, or improve market penetration with a particular wholesaler or retailer.[5] (*Id.*, at 6, 13-14.) These inter-area differences in the price of goods at the wholesale level create incentives to resell or relocate merchandise beyond the firms or locations targeted by the original seller of the goods. (*Id.*) This practice is referred to as "diverting."

The parties dispute two points pertaining to the general practice of diverting. As Reynolds recognized, retailer and wholesaler diverting can "wreak havoc" on manufacturers' marketing programs by diverting goods both (a) away from targeted market areas and (b) into areas where manufacturers may have entirely different marketing objectives. (*Id.*, at 14.) Defendants note that Reynolds himself reported that manufacturers frequently go to significant lengths to identify diverted merchandise and put a stop to diverting. (*Id.*) Plaintiffs acknowledge that manufacturers of consumer packaged goods often disapprove of the diverting of the goods (*Id.*, at 13-14; Robert D. Reynolds Deposition of 8/30/2000, DX 39, at 149), but they assert that monitoring costs and other concerns can cause manufacturers to acquiesce in such diverting. (Timothy John Avers Deposition of 2/29/00, Plaintiffs' Exhibit in Support of Memorandum in Opposition to Defendants' Motion for Summary Judgment ("PX") 7, at 162-64; 9/21/00 Report of Stephen J. Hoch, PX 30, at 3-4.) Another factor that encourages diverting is the need for manufacturers' salespeople to meet sales quotas; they can do so by selling to buyers they know to be diverters. (Reynolds Rep., at 15; 3/16/00 Deposition of Timothy John Avers, PX 8, at 334.)

The parties' second point of disagreement concerns the relationship between TPI's ownership of retail stores and the success of its diverting business. Defendants argue that TPI's retail business provided a kind of protective "cover," a purported destination for manufacturing

---

[5]      The court uses the term "manufacturers" for clarity. Plaintiffs' expert Robert D. Reynolds uses the terms "manufacturers," "brand sellers," and "vendors" interchangeably in his report.

salespeople seeking to make covert sales without alerting their superiors to the possibility of diversion. (Reynolds Rep., at 15-18; Avers Dep. of 2/29/00, DX 73, at 70, 168.) Altheimer argues further that while companies can divert products without owning retail stores, companies must have a "retail presence," such as an agreement to supply retail stores, in order to divert product. (Defs.' 56.1 Resp. ¶ 266.) Plaintiffs argue that TPI's retail stores benefitted its diverting business but were not a necessary part of the Alpers' post-transaction diverting business. (Reynolds Rep., at 24.) Because TPI sold all its retail stores in the DTS transaction, the question of whether the diverting business required a simultaneous retail presence is potentially crucial to damages determinations in this case.

### TPI's Diverting Business

TPI's diverting business involved the wholesale purchase and sale of consumer packaged goods: TPI purchased consumer packaged goods directly from manufacturers and resold those goods at a profit to other distributors and wholesalers. (M. Alper Aff. ¶ 5; M. Alper Dep. of 4/11/00, at 106, 157; Batkiewicz Dep. of 7/11/00, at 19-21; P. Alper Dep. of 5/25/00, at 66-67; Avers Dep. of 2/29/00, at 73-75.) TPI's largest diverting customers were Purity Wholesale Grocers of Florida and Victory Wholesale Grocers of Ohio. (Avers Dep. of 2/29/00, at 73-75.) Wholesalers that purchased diverted products from TPI (usually Purity or Victory) themselves resold the products to other wholesalers or retailers. (Avers Dep. of 2/29/00, at 75-76.) TPI often purchased products from manufacturers and shipped them directly to third parties, without ever using a TPI warehouse or truck. (M. Alper Dep. of 4/11/00, at 108; Batkiewicz Deposition of 11/25/96, DX 32, at 108.) Batkiewicz testified that in 1995, he did not want TPI to have the "image" of being a diverting company because "[i]t wouldn't have been good for the diverting business" in part because some manufacturers would not have publicly approved of diverting. (Batkiewicz Dep. of 7/11/00, at 118.) In 1995, TPI instituted a program to demonstrate to manufacturers that TPI was putting all of their

products in TPI's retail stores; in fact, TPI continued to divert, and placed as little of the manufacturers' product as possible into the stores. (August 23, 1995 Memorandum from Avers to Batkiewicz, DX 50; Avers Dep. of 2/29/00, at 154-56.) TPI's policy was never to volunteer to a manufacturer that TPI was diverting, but to answer honestly if asked. (Avers Deposition of 3/16/00, PX 74, at 242-43; Batkiewicz Dep. of 7/11/00, at 75.)

Although as noted, the parties disagree over the extent to which manufacturers opposed or acquiesced in diverting, they agree that some manufacturers have stated policies against diverting. The parties agree, further, that for several reasons, TPI's dollar stores were an excellent destination for salespeople who wanted to meet their sales quotas. (Reynolds Rep., at 16-18.) First, dollar stores are out of the mainstream and most manufacturers pay little attention to the dollar store channel; manufacturers rarely audit the performances of dollar stores or track their results because their total sales are relatively insignificant. (*Id.*, at 16-17.) Second, manufacturers' marketing analysis systems are unable to collect useful data from dollar stores because such stores do not use automated scanners for their sales information or track their sales in any systematic way. (*Id.*, at 17.) Third, TPI proved to be an attractive purchaser because its employee Tim Avers was familiar with the mainstream grocery industry and had made excellent personal contacts with sales personnel; TPI was always looking to buy divertable products; and TPI paid on time. (*Id.*, at 18.)

According to the Alpers and their expert Roger Reynolds, TPI employees Avers and Ray Freeman were absolutely critical to the operation of TPI's diverting business. (5/24/00 Deposition of Michael Alper, DX 24, at 978; M. Alper Dep. of 3/26/96, at 302; Reynolds Rep., at 20; M. Alper Aff. ¶ 6.) In general, Tim Avers was responsible for purchasing goods from various manufacturers, and Ray Freeman was responsible for reselling the same items. (Avers Dep. of 2/29/00, at 41-42.) As a business, diverting is based on personal contacts and a knowledge of business and customs,

rather than "bricks and mortar."[6] (Reynolds Rep., at 20; M. Alper Aff. ¶ 6.) According to the Alpers, the only assets required to run the diverting business were the knowledge and relationships possessed by Avers and Freeman, some leased office space, equipment, furnishings, and very limited warehouse space. (M. Alper Dep., at 254-60.) The Alpers' expert concluded that "Avers and Freeman were the diverting business at TPI." (Reynolds Rep., at 20.)

**The Transaction with DTS**

Unsurprisingly, the parties have very different understandings of the transaction between TPI and DTS. In brief, a transaction that Plaintiffs argue was intended merely to convey some of TPI's assets to DTS (M. Alper Aff. ¶¶ 8-9), ultimately conveyed all of the Alpers' TPI stock, and all of the company's assets. (Agreement; Deposition of Myron Lieberman of 10/29/97, Defendants' Exhibits in Opposition to Plaintiffs' Motion For Summary Judgment ("DXO") 24, at 63-64.) The Alpers' intentions for the transaction, the content of their instructions to Altheimer, and the degree to which Altheimer complied with its instructions are central issues in this case. At any rate, no matter what the Alpers' intentions may or may not have been, it is undisputed that they closed a deal on January 31, 1996 in which they sold their shares in TPI to DTS for $53 million in cash and $2 million in multi-price point inventory.[7] (Agreement for Purchase and Sale of Stock, DX 62.) The Alpers argue that the exclusion of the diverting business from the sale to DTS was critical to the deal, and that they would not have engaged in the transaction if they had not believed that the diverting business was excluded from the transaction. (P. Alper Dep. of 5/25/00, at 171.) In fact,

---

[6]     These facts were presented in Altheimer's statement of facts in opposition to summary judgment, a submission that Plaintiffs never responded to. Accordingly, the court deems them undisputed and admitted.

[7]     Multi-price point inventory is inventory sold at a price of more than one dollar. (Brock Dep. of 4/4/96, at 61, 97-98.) DTS had acquired this inventory but was willing to transfer it to the Alpers because DTS was primarily interested in selling goods at or below one dollar. (Id.) As noted below, the final Non-Compete Agreement between TPI and DTS left room for the Alpers to operate retail stores that sold the vast majority of their goods at prices higher than the $1.10 to $2 range. (Agreement § 1.3.2.)

the Alpers suggest, they wanted to sell certain assets of TPI precisely so that they could focus on and expand their diverting business. (M. Alper Dep. ¶ 8; Pls.' 56.1(b) Statement ("Pls.' 56.1") ¶ 165.) The Defendants argue that the parties to the DTS transaction never understood or agreed that TPI's diverting business was being withheld from the deal. (11/14/97 Schlossberg Dep., at 7-8, 24-25.) Defendants have not specifically addressed the question of whether they themselves understood or agreed that TPI's diverting business was being withheld from the deal. As noted below, however, Defendants do address a related point: they contend that the Alpers never told Altheimer of their intention to continue the diverting business after closing. (Lieberman Dep. of 10/29/97, at 87.)

**Negotiations in the TPI transaction**

### A. The Initial Negotiations

The negotiations between TPI and DTS were initiated in September 1995 when John Megrue of DTS called Mr. Alper on the telephone. (M. Alper Dep. of 4/11/00, at 292.) On September 18, 1995, the Alpers and Art Morrison, their accountant and business advisor, met with Megrue, Macon Brock, and Joan Brock of DTS to discuss a potential transaction between TPI and DTS. (M. Alper Dep. of 3/26/96, at 106-07; P. Alper Dep. of 5/25/00, at 182-84.) During this meeting, the Alpers told DTS representatives that they wanted some of the current TPI employees to work in the Alpers' business after the transaction. (M. Alper Dep. of 3/26/96, at 108-09.) The DTS representatives observed that DTS wasn't in the wholesale business and had no interest in engaging in such a wholesale business, but that a non-compete agreement would have to be worked out limiting the Alpers' entry into the retail business.[8] (Megrue Dep. of 4/9/96, at 95-96; 4/4/96 Deposition of Macon Brock Dep., DXO 17, at 79-80.) During a break in this meeting, the

---

[8]     These facts were presented in Altheimer's statement of facts in opposition to summary judgment, a submission that Plaintiffs never responded to. Accordingly, the court deems them undisputed and admitted.

Alpers reminded their business advisor, Art Morrison, not to mention TPI's diverting business to the DTS representatives. (10/23/96 Deposition of Arthur H. Morrison, DX 37, at 76-77.) Although they had represented they had no interest in wholesaling, the DTS representatives believed after the September 18, 1995 meeting that they were negotiating to purchase the Alpers' entire company, with certain limited exceptions that did not relate to the diverting or wholesale business. (Brock Dep. of 3/28/00, at 167-69, 172-73.; Compton Dep. of 4/4/96, at 38-39; Megrue Dep. of 3/7/00, at 65-67.)

On September 19, 1995, Megrue sent the Alpers a letter enclosing a draft confidentiality agreement and notes purporting to summarize the deal as discussed in the September 18 meeting with the Alpers. (9/19/95 Letter from Megrue to Morrison ("Megrue Letter"), DX 51; M. Alper Dep. of 3/26/96, at 129; 7/12/00 Deposition of Pamela Alper, DX 27, at 436.) In the notes and letter Megrue sent to the Alpers summarizing the September 18 meeting, Megrue made no explicit mention of excluding either the wholesale or the diverting business from the sale of TPI.[9] (Megrue Letter.) Megrue did state that after the sale, the Alpers would be free to "build" a wholesale business. Specifically, in the September 19th notes enclosed with his letter, Megrue stated the following:

> Non-Compete: We need to agree on specific language, but the spirit is that the Alpers will be free to build a broad based wholesale business, but would agree to limitations concerning any future retail activities that are significantly competitive with the Dollar Bills/Dollar Tree (i.e. retail focused primarily on low price variety goods).

(Megrue Letter.)

As discussed more fully below, some time after their September 18 meeting with Megrue

---

[9]     Plaintiffs contend, however, that Megrue's notes refer implicitly to the exclusion of their wholesale/diverting business from the TPI sale. Plaintiffs point specifically to references in Megrue's notes to a non-compete agreement, a statement that "the spirit is that the Alpers will be free to build a broad based wholesale business," and a discussion of the possibility of coming to "two different non-solicit/non-hire Agreements" . . . to each parties [sic] mutual satisfaction."

and others, but before September 23, the Alpers retained Lieberman to represent them in connection with the sale of their business. The Alpers told Lieberman that they did not agree with Megrue's summary of the meeting, and asked Lieberman to put some thoughts about the deal in writing, send a letter to Megrue, and follow it up with a phone call.[10] (M. Alper Dep. of 4/12/00, at 521-23, 543.) On September 23, 1995, Lieberman sent the Alpers a draft response to Megrue's September 19 letter which included the language that the Alpers "will be able to engage, not only in the wholesale business, but in the retail business."[11] (9/23/95 Draft Letter from Lieberman to Megrue ("Draft Letter"), DX 52, at 2; M. Alper Dep. of 4/12/00, at 558; P. Alper Dep. of 7/12/00, at 487-490.) The draft response that Lieberman sent to the Alpers also contained the following language: "We are certain that once you do further due diligence and analysis of the advantages of putting our two companies together, that you will agree that a higher price is certainly justified." (Draft Letter, at 1.) The draft response did not contain any language to the effect that the wholesale or diverting business was to be excluded from the transaction. (Draft Letter; P. Alper Dep. of 7/12/00, at 494.) The Alpers reviewed and made written changes to Lieberman's draft letter, but their changes made no reference to the exclusion of the existing wholesale or diverting business from the sale to DTS (Draft Letter; P. Alper Dep. of 7/12/00, at 487-493), and Plaintiffs concede that they did not instruct Altheimer to provide for any such exclusion. (M. Alper Dep. of 4/12/00, at 565; P. Alper Dep. of 7/12/00, at 493.) Nor is there any evidence that Altheimer suggested such language.[12] On October 6, 1995, the Alpers sent DTS a response to Megrue's

---

[10] Mr. Alper testified that the Megrue's letter proposed a sale price lower than the one discussed in the initial meeting and failed to reflect the Alpers' desire to keep the "Dollar Bill$" name. (*Id.* at 522-523, 543.)

[11] The parties have not indicated whether they believed this language referred to a new wholesale business or a continuation of the Alpers' old wholesale business.

[12] The record before the court does not indicate whether Altheimer knew that DTS was unaware of TPI's diverting business.

letter which the Alpers personally signed; the response did not state that the wholesale or diverting business would be excluded from the sale to DTS. (10/6/95 Letter from Alpers to Megrue, DX 53; M. Alper Dep. of 4/12/00, at 566-569; P. Alper Dep. of 7/12/00, at 462.)

In their depositions, the Plaintiffs acknowledged that in communicating with DTS during the negotiations, they never used the word "diverting" and never disclosed that TPI operated a diverting business, as opposed to a traditional wholesaling business. (M. Alper Dep. of 4/12/00, at 624-26; P. Alper Dep. of 7/13/00, at 573-77.) Mrs. Alper testified that Defendant Lieberman assured the Alpers that "there wasn't an interest" on the part of DTS in acquiring TPI's wholesale operations, and that there was therefore "[n]o reason to make a deal and an issue of things" in shaping the transaction documents.[13] (Id. at 574.) In a November 3, 1995 memorandum to the Alpers addressing the DTS offer for TPI, TPI's Chief Financial Officer Ray Batkiewicz wrote:

> The first sheet shows some calculations based on our entire business. The second sheet shows the same analysis, but gives no value to the diverting business. I think one of the obstacles is that [DTS does] not know that [the diverting] business exists and therefore assign[s] a lower value to the [TPI total] business than we might otherwise expect.

(11/3/95 Batkiewicz Memo to the Alpers, DX 54, at 1; Batkiewicz Dep. of 7/11/00, at 164-165.) On November 27, 1995, in response to a request from DTS for financial information concerning TPI, Batkiewicz wrote that TPI had "effectively discontinued our wholesale operation and all projections related to that business are to be ignored."[14] (11/27/95 Batkiewicz "Dollar Tree Due Diligence Package #5" Letter, DXO 50, at ALT 002137.) DTS representatives testified that they had never heard of the business of "diverting" and did not know that TPI operated a diverting business until after the Alper/DTS transaction documents were signed on January 16, 1996. (Brock Dep. of 4/4/96, at 61-62; 4/4/96 Deposition of H. Ray Compton, DXO 18, at 68-69; Megrue Dep. of 4/9/96,

---

[13]     Defendant Lieberman has not denied making these statements.

[14]     The record does not indicate whether Altheimer attorneys ever saw Batkiewicz's memo or his letter to TPI prior to the closing of the TPI-DTS transaction.

at 76-77; 4/9/96 Deposition of J. Perry, DXO 27, at 50-53, 59-60.)

Between October 6 and mid-November 1995, Lieberman and Megrue continued to negotiate over the purchase price. (Lieberman Dep. of 10/29/97, at 41, 97.) The initial price range discussed by DTS representatives—$45 to $50 million—was too low for the Alpers. (M. Alper Dep. of 3/26/96, at 109-110.) On October 25, 1995, Lieberman, the Alpers, Batkiewicz, and Megrue met in a hotel near Chicago O'Hare airport. (P. Alper Dep. of 5/26/00, at 305; Lieberman Dep. of 10/29/97, at 29-31.) During the meeting, Lieberman suggested to Megrue that an election under Section 338(h)(10) might add additional value to the transaction for DTS. (Lieberman Dep. of 10/29/97, at 63.) As summarized by Lieberman, a Section 338(h)(10) election permits a buyer and seller in a stock transaction to treat the transaction as a sale of assets for tax purposes under certain limited circumstances. (Id., at 63, 99; 26 U.S.C. § 338(h)(10).) Such an election can result in a different tax treatment for goodwill, resulting in higher taxes for the seller but lower taxes for the buyer: when the buyer's tax savings far exceed the seller's tax losses, an election can facilitate a higher negotiated purchase price. (Lieberman Dep. of 10/29/97, at 63, 99-100.) After the October 25, 1995 meeting and several other meetings and conversations between Lieberman and Megrue, by mid-November 1995, DTS offered a purchase price to the Alpers' liking: $53 million in cash plus $2 million in "multi-price point inventory" from the TPI warehouse.[15]

## B.    The stock purchase agreement

On November 28, 1995, William Old, the attorney representing DTS in the transaction with TPI, sent Lieberman an initial draft of the stock purchase agreement. (11/28/95 Draft Agreement for Purchase and Sale of Stock ("Draft Agreement"), DXO 51.) On the first page of the draft, the agreement stated that the Alpers "shall sell and deliver, and [DTS] shall purchase, all of the Shares

---

[15]    The parties' submissions do not indicate the dates on which DTS made or the Alpers accepted this offer.

14

[of TPI] on the terms and conditions set forth below." (Draft Agreement, at 1.) The draft did not provide for exclusion of the wholesale or diverting business from the sale of TPI to DTS. (Draft Agreement.) On November 30, 1995, the Alpers and Batkiewicz met with Defendants Schlossberg and Lieberman to discuss the initial draft of the stock purchase agreement. (9/12/96 Deposition of Robert L. Schlossberg, DX 42, at 31; P. Alper Dep. of 7/12/00, at 543-44.) The Alpers had the opportunity at that time to review the initial draft and ask any questions they had relating to it. (M. Alper Dep. of 5/23/00, at 700-02, 732; 7/13/00 Deposition of Pamela Alper, DX 28, at 682-83; P. Alper Dep. of 4/10/96, at 82.) The Alpers acknowledge that Schlossberg and Lieberman did not fail or refuse to answer any of their questions and that the Alpers did not ask their attorneys why the wholesale or diverting business was not excluded from the stock sale purchase agreement. (M. Alper Dep. of 5/23/00, at 734-35, 864; M. Alper Dep. of 5/24/00, at 942-43; P. Alper Dep. of 7/13/00, at 701.)

During the November 30 meeting, the Alpers, Lieberman, and Schlossberg prepared a list of business points relating to the initial draft of the stock purchase agreement to discuss with DTS; the list includes no explicit mention of the exclusion of the wholesale or diverting business in the list of points, but Plaintiffs argue that certain references in the documents to a three-year covenant can fairly be read as reflecting the Alpers' interest in this exclusion. (11/30/95 List, DX 57; 11/14/97 Deposition of Robert Schlossberg, DX 43, at 54-55.) Thus, Plaintiffs contend that list entry #6, which reads, "covenant 3 years . . . no more than (unclear number) . . . variety stores only," was a reference to the exclusion of the wholesale or diverting business. (11/30/95 List; Plaintiffs' Rule 56.1(b) Statement ("Pls.' 56") ¶ 63.) The final list of points prepared on December 1, 1995 makes no explicit mention of excluding the wholesale or diverting business from the sale to DTS; Plaintiffs again argue that references in the list to the Non-Competition Agreement and a new "non-hire" restriction reflected effort to protect the diverting business or exclude it from the transaction.

(12/1/95 List of Major Economic Points, DX 58; Pls.' 56.1 ¶ 66.)

On December 19, 1995, Schlossberg sent Old, Batkiewicz, and the Alpers a marked-up copy of the November 29 draft of the stock purchase agreement without any changes in the language "The Sellers wish to sell, and Buyer wishes to purchase, the Shares of TPI, on the terms and conditions set forth herein." (12/19/95 Draft Agreement for Purchase and Sale of Stock ("12/19/95 Draft Agreement"), DX 59, at 1.) The Alpers received several drafts of the stock purchase agreement, but did not receive a complete copy of the final version at the time they signed it. (M. Alper Dep. of 3/26/96, at 84-85, 141, P. Alper Dep. of 4/10/96, at 82-83.) Instead Altheimer sent only the signature pages from the final version, pages that the Alpers then signed and returned.[16] (Alpers' Federal Complaint of 2/21/97 ("2/21/97 Federal Compl."), DX 12 ¶ 19.) The Alpers do not argue, however, that the final version differs in any material respect from the earlier drafts.

Between November 30, 1995 and January 16, 1996, the Alpers had opportunities to ask Altheimer questions about the meaning of the draft stock purchase agreements. (M. Alper Dep. of 5/23/00, at 732, 909.) The Alpers do not recall either telling Altheimer that they did not understand the meaning of any of the draft agreements or asking any Altheimer attorney to explain whether or how the agreements excluded the wholesale or diverting business from the transaction. (M. Alper Dep. of 3/26/96, at 127; M. Alper Dep. of 5/23/00, at 717-18.) Batkiewicz, similarly, testified that during the course of negotiations, he received additional drafts of the stock purchase agreement and had approximately 75 conversations with Schlossberg. He never instructed Schlossberg or anyone else at Altheimer to carve out the wholesale or diverting business from the transaction. (Batkiewicz Dep. of 3/29/96, at 63; Batkiewicz Dep. of 7/11/00, at 225; Batkiewicz Dep. of 7/14/00, at 411, 413.) As noted below, the Alpers did discuss diverting with Altheimer: they

---

[16]     The record before the court does not indicate which of Altheimer's lawyers caused the signature pages to be sent to the Alpers.

16

answered affirmatively when Lieberman specifically asked them if TPI engaged in "diverting." (M. Alper Dep. of 4/12/00, at 450, 473; Lieberman Dep. of 10/29/97, at 14-15.) The record contains no indication whether Lieberman raised with the Alpers the question of whether the purchase agreement should address diverting.

### C. The Non-Competition Agreement

The draft contract documents that Olds sent Lieberman on November 28, 1995 also contained the first draft of a proposed Non-Competition Agreement. (11/28/95 Draft Agreement, at D04348.) DTS insisted on a Non-Competition Agreement to keep the Alpers from interfering with DTS's business after acquisition. (Megrue Dep. of 3/7/00, at 52-53.) In part, the Agreement restricted the Alpers' ability to operate stores where 35% of their goods sold at or below $2 or more than 20% of their goods sold at $1.10 or less. (Agreement, § 1.3.2.) In addition, DTS initially took the position that the Alpers must be barred from soliciting or hiring any of TPI's current employees, with a few exceptions. (11/28/95 Draft Agreement, at D04349.) There was never any discussion of any restrictions on DTS's activities after the contemplated transaction: the Alpers did not negotiate for restrictions from DTS; DTS did not offer to restrict its own activities; and the Alpers never asked Altheimer to seek any promises from DTS restricting DTS's post-acquisition activities. (Brock Dep. of 3/28/00, at 54-56, 177-78; Compton Dep. of 4/4/96, at 175-78; Megrue Dep. of 4/9/96, at 38-39; M. Alper Dep. of 5/23/00, at 871; M. Alper Dep. of 5/24/00, at 1261.) The draft Non-Competition Agreement restricted the Alpers' ability to enter into a retail business for a five-year period after the closing of the transaction, but did not restrict their post-closing activities in any wholesale business. (11/28/95 Draft Agreement.) The draft Agreement also provided that after the closing, the Alpers could not hire or solicit any current TPI employees for five years, with the exception of specific employees who would be identified on an attached schedule (the schedule attached to the draft was blank). (*Id.*)

17

During the course of negotiations, the Alpers focused on the terms of the November 28, 1995 draft Non-Competition Agreement even more closely than they focused on the terms of the draft Stock Purchase Agreement. (M. Alper Dep. of 3/26/96, at 141-42.) They felt that the agreement's terms were not the ones they had agreed upon, and they sought to ease the restrictions on their post-transaction retail activities and their potential hiring of current TPI employees.[17] (Id.; Batkiewicz Dep. of 7/14/00, at 368-370.) In or around the first week of December 1995, Batkiewicz told Schlossberg that he and the Alpers had decided that the Non-Competition Agreement issues should be negotiated directly between the business people, without the assistance of the lawyers. (Schlossberg Dep. of 11/14/97, at 37-41; Lieberman Dep. of 10/29/97, at 77-78.) Schlossberg agreed that the nature of the retail restrictions, and the identity of the personnel whom the Alpers desired to employ in their new venture after the closing, were much better known to the Alpers and DTS representatives than to their respective lawyers.[18] (Schlossberg Dep. of 11/14/97, at 40-41.)

Between about December 12 and December 15, 1995, Batkiewicz and the Alpers negotiated extensively with DTS representatives over the retail and non-hire/non-solicit restrictions in the Non-Competition Agreement. (Batkiewicz Dep. of 7/14/00, at 386-99; 12/14/95 Letter from Batkiewicz to DTS employee H. Ray Compton, DXO 58;[19] 12/15/95 Letter from Batkiewicz to

---

[17]     It is not clear whether the Alpers conveyed this frustration to Altheimer. Batkiewicz testified that on December 8, 1995, he sent a memo to Schlossberg that stated the following: "Our [TPI's] ability to set up a closeout retail business not in [DTS's] price range was always a given from the first meeting with John Megrue and Macon Brock, as was the ability for Pamela and Michael to take with them the people they choose." (Batkiewicz Dep. of 7/14/00, at 369-370.) Other than this excerpt, which Batkiewicz read into the record, the memo does not appear in the record.

[18]     See footnote 8: Defendants set forth these facts—concerning the Alpers' desire to engage in direct negotiation of the Non Compete Agreement—in their responses to Plaintiffs' motion for summary judgment, to which Plaintiffs have not replied.

[19]     Neither the letters to Compton nor the excerpts from his deposition transcript on the record before the court indicate what his title or job responsibilities at DTS were.

Compton ("12/15/95 Batkiewicz Letter"), DXO 59.) On December 12, 1995, there was a lengthy conference call between the Alpers, Batkiewicz, and four DTS representatives to discuss the issues. (M. Alper Dep. of 3/26/96, at 132-135.) During the call, Mrs. Alper told DTS representatives that the restrictions against the Alpers on hiring and soliciting current TPI personnel were too strict; Mrs. Alper said that DTS should "let people choose," apparently in reference to employees' choice of workplace. (Batkiewicz Notes on 12/12/95 Conference Call, DXO 57, at 50015; Batkiewicz Dep. of 7/14/00, at 366-68.) Three days later, in his December 15, 1995 letter, Batkiewicz sought Compton's agreement to a summary of the parties' positions, so that "we can arrange a joint conference call with the attorneys to communicate this resolution and to 'turn up the fire' on them to resolve the open legal issues as expeditiously as possible and to get us both a revised contract quickly." (12/15/95 Batkiewicz Letter.) On December 28, 1995, DTS's lawyers completed a revised draft Non-Competition Agreement and sent it to Schlossberg. (12/28/95 Draft Agreement, DXO 61.)

On January 16, 1996, DTS circulated a draft Non-Competition Agreement that listed Avers on an attached schedule with the notation "4 Months" next to his name. (1/16/95 Draft Non-Competition Agreement, DXO 63, at D03946; Batkiewicz Dep. of 7/14/00, at 440-44.) If this change had been implemented, it would have prevented the Alpers from hiring or soliciting Avers for a period of four months after the transaction closed.[20] (Id., at 440-42.) On the morning of January 16, 1996, Batkiewicz told Brock that the Alpers needed to be able to hire Avers immediately after the transaction closed, and warned that the issue was a "deal breaker." (Id. at 440-444.) That morning, the Non-Competition Agreement was revised to categorically exclude all TPI employees involved in the "wholesale" operations of TPI from the non-solicitation/non-hire

---

[20]    See footnote 8.

restrictions against the Alpers.[21] (Non-Competition Agreement; Batkiewicz Dep. of 7/14/00, at 442-46.) During his conversation with Brock, which the Alpers were informed of, Batkiewicz did not request and Brock did not give any promise that DTS would not hire Avers. (*Id.*, at 443-45.) Under the new language of the Non-Competition Agreement, either side was free to employ Avers immediately after the transaction closed.[22] (*Id.*, at 442-45; Non-Competition Agreement.)

**The Alpers' Notes of Meetings and Calls during the Transaction**

To help her remember what had happened during the negotiation process, Mrs. Alper took detailed notes of many of the major meetings and conversations between parties. (P. Alper Dep. of 5/25/00, at 142-43.) Mr. Alper had a high degree of confidence in the accuracy of her notes. (M. Alper Dep. of 4/12/00, at 547-48.) Mrs. Alper has notes of the September 18, 1995 meeting in Morrison's office; the September 18 meeting with Lieberman; a later phone call with Lieberman; a November 30 meeting with Altheimer to discuss the first drafts of the transaction documents;[23] the December 12 conference call with DTS; and numerous other calls or meetings. (P. Alper Notes of Meeting with Morrison on 9/18/95, DXO 42; P. Alper Notes of Meeting with Lieberman on 9/18/95, DXO 43; P. Alper Notes of phone call with Lieberman on 9/22/95 ("P. Alper notes of 9/22/95"), DXO 45; P. Alper Notes of O'Hare Meeting on 10/25/95, DXO 49; P. Alper Notes of Meeting with Altheimer on 11/30/95, DXO 53; P. Alper Notes on Conference Call of 12/12/95 ("P. Alper notes of 12/12/95"), DXO 56; P. Alper Notes of O'Hare Meeting on 1/10/96, DXO 62.)

---

[21]     In his testimony, Batkiewicz said that Brock verbally approved the removal of Avers from the list of employees whom the Non-Compete Agreement prevented the Alpers from immediately rehiring. (*Id.*, at 443.) The record does not indicate who actually altered the transaction documents. Batkiewicz reported his conversation with Brock and the changes in the Non-Compete Agreement to Schlossberg at an unspecified point after Brock approved the changes. (*Id.*, at 446.)

[22]     See footnote 8.

[23]     Mrs. Alper's notes do not indicate which Altheimer attorney or attorneys attended this meeting.

Although the notes are occasionally difficult to read, they contain no reference to the exclusion of the wholesale or diverting business from the transaction.[24] (*Id.*) In addition, instead of references to "continuing" or "retaining" the wholesale or diverting business, Mrs. Alpers refers in several instances to either a "new business" or to "building" or "starting" a business. (P. Alper notes of 9/22/95, at ALP 0340; P. Alper notes of 12/12/95, at 2.)[25]

### Altheimer's Representation of the Alpers in the TPI transaction

On September 18, 1995, after their first meeting with DTS representatives, the Alpers met with Defendant Lieberman for the first time to discuss the possibility of his representing them in the transaction between TPI and DTS. (4/24/00 Deposition of Michael Alper, DX 24, at 447; P. Alper Dep. of 5/25/00, at 226-27.) During their initial meeting with Lieberman, the Alpers explained to him what had transpired at the meeting earlier in the day between the Alpers and the DTS representatives. (M. Alper Dep. of 4/12/00, at 447-451; P. Alper Dep. of 5/25/00, at 227.) The Alpers told Lieberman that TPI engaged in a retail business and a wholesale business, and, in response to a question from Lieberman, the Alpers acknowledged that TPI engaged in "diverting." (M. Alper Dep. of 4/12/00, at 450, 473; Lieberman Dep. of 10/29/97, at 14-15.)

At the initial September 18, 1995 meeting, Lieberman and the Alpers also discussed Lieberman's fees. (Lieberman Dep. of 4/12/000, at 450-51; Lieberman Dep. of 10/29/97, at 13, 20.) The Alpers asked Lieberman to put a cap on potential fees of $75,000, but Lieberman said that he could not do that. (*Id.*) Lieberman explained that when the transaction was finished, he

---

[24]    See footnote 8.

[25]    In support of this proposition, Defendants also cite handwritten notes that Mr. Alper took on the December 12, 1995 meeting, but the court is unable to read the photocopies that have been submitted. (M. Alper Notes of 12/12/95, DXO 55.) Similarly, the court is unsure what to make of Defendants' submission of a note entitled "Higher Price." *See* DXO 72. While this document clearly pertains to the transaction between DTS and the Alpers, and intriguingly mentions "wholesale and distributing" as one of the reasons that DTS should pay more for TPI, the document does not indicate who prepared it or when.

would look at what the fees would be if they were calculated based strictly on the time expended by Altheimer lawyers, and then discuss with the Alpers what he thought would be a "fair fee" for them based on the value that he believed Altheimer had added to the transaction. (Lieberman Dep. of 10/29/97, at 20.) In addition, Lieberman told the Alpers that they would not be obligated to pay him the fee that he would request, and that if they disagreed they could pay him whatever they thought was fair: if that occurred, Lieberman agreed that he would not sue them for recovery of a higher fee but would not represent the Alpers in any future transactions either. (*Id.*, at 20-21.) Lieberman did not say that the "fair fee" would be based on or contingent upon the result of the transaction. (*Id.*, at 21.)

At an unspecified date a few days after their first meeting with Lieberman, the Alpers retained Altheimer to represent the Alpers' interests in connection with the DTS transaction. (M. Alper Aff. ¶ 10; Defendants' Rule 12(M) Statement of 5/29/98 ("Defs.' 12M") ¶ 4; Lieberman Dep. of 10/29/97, at 16, 20.) The Defendants never executed a written fee agreement with the Alpers, however. (10/29/97 Deposition of Myron Lieberman, PX 19, at 20-21.)

Defendant Lieberman (and Defendant Altheimer) were advised and understood that the Alpers expected to retain use of the TPI name after the conclusion of the transaction with DTS. (Ans. ¶ 16.) At an unspecified date between the Alpers' hiring of Altheimer and the ultimate closing of the transaction with DTS on January 31, 1996, the Defendants incorporated a new corporation, to be known by the name of the Alpers' previous business, 'Terrific Promotions, Inc.' (Ans. ¶ 39.) In another of the disputes central to this controversy, the parties disagree over whether Defendants understood that Plaintiffs intended this corporation would be a continuation of TPI's existing diverting business (Plaintiffs' Statement of Additional Facts Requiring the Denial of Defendants' Motion for Summary Judgment ("Pls.' Add. Facts") ¶¶ 170, 176) or a new entity founded to conduct a new retail and wholesale business. (Lieberman Dep. of 10/29/97, at 34-35.) The Alpers allege

that Altheimer formed the new corporation at their request (Pls. Add. Facts ¶¶ 170, 176); Altheimer argues that it formed this corporation at the request of Sidley & Austin, the law firm the Alpers retained to represent them in connection with their contemplated post-sale business.[26] (Defs' Local Rule 56.1 Response to Plaintiffs' Statement of Additional Facts Requiring the Denial of Defendants' Motion for Summary Judgment ("Defs.' Resp. to Pls.' Add. Facts") ¶¶ 170, 176; Schlossberg Dep. of 8/10/00, at 157-58.) In either case, Defendants knew that the Alpers intended for the new TPI to pursue a diverting business employing some of the same employees as the old TPI. (Schlossberg Dep. of 11/14/97, at 28-30, 73-74, 92.) There is conflicting evidence on the question of whether Defendants knew (id., at 73-74, 92), or did not know (id., at 28-30; Fischer Dep. of 11/13/97, at 56) before the transaction closed how critical employees such as Avers were to TPI's past and future diverting plans. It is undisputed that at least as early as December 1995, the Defendants had been advised and understood that DTS was not interested in pursuing the Alpers' wholesale business. (Schlossberg Dep. of 11/14/97, PX 23, at 24-25; 11/13/97 Deposition of Barry Fischer, Altheimer Attorney, PX 14, at 55-56.) Defendants assert, however, that DTS had not yet learned of TPI's diverting (or "wholesale merchandising") business at the time that it disclaimed interest in TPI's "wholesale" business.[27] (Defs.' Resp. to Pls.' Add. Facts, at 8; Brock Dep. of 4/4/96, at 61-62; Megrue Dep. of 4/9/96, at 76-77.)

Defendant Lieberman assured the Alpers that he would at all times carefully oversee all professional activities rendered to and on behalf of the Alpers by Altheimer. (Ans. ¶¶ 18-21.) In fact, however, once Defendant Schlossberg became involved in the transaction, Lieberman did not

---

[26]     More detail about the Alpers' hiring of Sidley & Austin follows below. The court notes it is uncertain why Sidley would have asked Altheimer, a rival Chicago law firm, to perform legal work for Sidley.

[27]     The court notes further that even after DTS learned of the diverting business, it might have either publicly changed its mind about acquiring TPI's "wholesale" business or maintained a strategic silence about the potentially slippery distinction between "wholesale" and "wholesale merchandising."

supervise the DTS transaction on a regular basis. (Lieberman Dep. of 10/29/97, at 26.) In addition, the Defendants concede that in agreeing to represent the Alpers, they never set any limits on their representation and or their responsibility for the DTS transaction. (Lieberman Dep. of 9/19/00, at 155, 168; Schlossberg Dep. of 8/10/00, at 151, 163.)

The Defendants concede that their representation of the Alpers required them to ask sufficient questions of their clients to understand their goals and objectives in connection with the DTS transaction. (Lieberman Dep. of 9/19/00, at 157.) The Defendants concede, further, that the drafting of the Non-Competition Agreement fell within the scope of their representation of the Alpers, and that they were responsible for ensuring that the Alpers understood what the Non-Competition Agreement would mean to them after February 1, 1996. (Schlossberg Dep. of 8/10/00, at 195, 198-99.) The Defendants acknowledge that prior to the close of the transaction with DTS on January 31, 1996, they never researched or considered the enforceability of the restrictions contained within the Non-Competition Agreement, in part because they were not representing the party who might seek to enforce it. (Id., at 193-98.)

Similarly, the Defendants concede that they had a duty to inform the Alpers of the ramifications of the transaction documents that Defendants prepared and to insure that the Alpers understood the advantages and disadvantages of the transaction. (Schlossberg Dep. of 11/14/97, at 121-22; Fischer Dep. of 11/13/97, at 50-51.) The Alpers have testified that they did not in fact understand the legal ramifications of the documents they executed, principally because their lawyers never explained the ramifications. (P. Alper Dep. of 7/13/00, at 682-687; M. Alper Dep. of 5/23/00, at 704-09; M. Alper Dep. of 3/26/96, at 89-93.) The Alpers allege specifically that they were completely unaware that the transaction documents prepared by the Defendants would enable DTS to assume control of the Alpers' diverting business. (M. Alper Aff. ¶ 16.)

At some point prior to the closing of the transaction with DTS, the Alpers informed Altheimer

that they intended to retain the law firm of Sidley & Austin ("Sidley") to counsel the Alpers regarding

their post-transaction business, because the Alpers wanted Sidley partner Newton Minow to serve

on the board of their new company.[28] (Schlossberg Dep. of 8/10/00, at 155-56.) In late November

1995, the Alpers met with Minow and his partner Michael Sigal, and entered into a formal retention

letter with Sidley on January 23, 1996, one week before the closing. (1/27/00 Deposition of Michael

Sigal, Sidley attorney, DXO 32, at 24-29; 11/29/95 Meeting Notes of Michael Sigal, DXO 52; Sigal

Letter of Engagement between Sidley and the Alpers of 1/23/96 ("Engagement Letter"), DXO 65.)

The Engagement Letter described Sidley's scope of representation in the following terms:

> [Sidley] will advise you [the Alpers] in connection with, and the scope of our
> engagement and duties to you shall relate solely to, your organization and operation
> of two corporations or other entities, one of which is to engage in the retail sale of
> grocery and other goods and the other of which is to engage in the wholesale
> distribution of such goods. It is contemplated that following our organization of
> these entities, we will also be engaged to provide legal services to them with
> respect to specific matters.

(Engagement Letter, at 1-2.)

**Defendants' Alleged Omissions**

It is undisputed that the transaction documents drafted by Defendants did not prohibit DTS

from competing in the diverting business with the new TPI or from hiring Avers and other

employees of the Alpers' diverting business. Defendants have testified that in preparing the

transaction documents, they intended to transfer the Alpers' interest in TPI's diverting business

even though the Defendants knew (a) that DTS was not interested in conducting such a business

and (b) that the Alpers would be engaging through the new TPI in some form of wholesale business

following the closing of the transaction with DTS. (Ans. ¶ 34; Schlossberg Dep. of 11/14/97, at 7-8,

24-25, 92.) Defendants have testified that, in preparing the transaction documents, they did not

---

[28] Schlossberg did not specify when the Alpers informed Altheimer of their intention
to hire Sidley, other than to say that he learned of the decision "before the [DTS] transaction
closed." (Schlossberg Dep. of 8/10/00, at 156.)

include provisions that would bar DTS from employing personnel from TPI's diverting business despite the fact that Defendants knew the Alpers intended to hire some of TPI's key employees for the new business and that the Alpers specifically considered it important for the new TPI to hire Avers. (Agreement; Defs.' Resp. to Pls.' Add. Facts ¶¶ 185, 205; Schlossberg Dep. of 11/14/97, at 28-30; Lieberman Dep. of 10/29/97, at 138.)

After DTS's lawyers prepared the initial draft documentation for the transaction, Altheimer revised numerous drafts of the transaction documents and negotiated key terms of those documents. (Deposition of William Old, DTS counsel, DXO 26, at 41; Defs.' Resp. to Pls.' Add. Facts ¶ 201; M. Alper Aff. ¶ 12.) Defendants argue that the Alpers and Batkiewicz themselves also directly negotiated many terms with DTS, including the terms of the non-competition, non-solicitation, and non-hire agreements. (Schlossberg Dep. of 11/14/97, at 37-40; Batkiewicz Dep. of 3/29/96, at 78-80.) As noted above, at the time of the execution of the DTS transaction, the Defendants sent the Alpers only the signature pages which the Alpers signed. (Schlossberg Dep. of 11/14/97, at 106-07; Ans., at 8-9.)

Plaintiffs allege that Altheimer never advised them that the proposed transaction documents were inconsistent with the Alpers' plans to continue their diverting business after closing. (Pls.' 56.1 ¶ 194.) As discussed later, Altheimer contends that the Alpers intended to initiate new retail and diverting businesses after closing. (Defs.' 56.1 Resp. ¶ 194.) Accordingly, Altheimer concedes that it never advised the Alpers of any inconsistency associated with the DTS transaction documents, because it saw none: Altheimer argues that it believed the Alpers wanted to start a new retail and wholesale business after the DTS transaction closed. (*Id.*; Lieberman Dep. of 10/29/97, at 34-35; Schlossberg Dep. of 8/10/00, at 200-01; Agreement.)

**DTS's Hiring of Avers and Freeman**

In December 1995 and January 1996, the Alpers received legal advice about the transaction

from Altheimer and from another lawyer, Richard Levin of Washington, D.C.[29] (8/11/00 Deposition of Richard F. Levin, DXO 21, at 59-60, 74, 82.) At an unspecified date in December 1995, Mr. Alper sent a draft of the Non-Competition Agreement to Levin to get his advice or opinion. (*Id.* at 82.) In early January 1996, Mr. Alper told Levin that the Alpers intended to take certain TPI personnel with them to run their business after closing the transaction with DTS. (*Id.*, at 104-05.) Levin and Mr. Alper discussed the possibility of putting those people under long-term employment contracts but Levin does not remember Mr. Alper's response to this idea. (*Id.*, at 105-06.) Nor did Levin communicate with any Altheimer attorneys concerning such a plan.

On January 11, 1996, the Alpers told Avers and Freeman about the impending sale. Also on January 11, either the Alpers or Batkiewicz told Avers that DTS had no interest in the business he was responsible for, and that DTS wanted resignations from him and Freeman by February 1, 1996.[30] (M. Alper Dep. of 3/26/96, at 231-235; P. Alper Dep. of 4/10/96, at 262-65; Avers Dep. of 2/29/00, DXO 75, at 214-15.) During the same meeting, the Alpers explained that they wanted Avers and Freeman to work for the new TPI after the sale, and Avers and Freeman orally agreed to work in the Alpers' post-transaction business. (M. Alper Dep. of 3/26/96, at 231-235; P. Alper Dep. of 4/10/96, at 262-65.) When Avers asked whether there would be any increase in his compensation, the Alpers told him he would continue on the same terms as before. (Avers Dep. of 2/29/00, at 214-15.)

Between January 16, 1996 (the day the transaction documents were signed by the Alpers and DTS) and January 31, 1996 (the day the transaction closed), DTS representatives visited TPI,

---

[29] The excerpted deposition transcript submitted to the court does not indicate the duration or nature of the Alpers' dealings with Mr. Levin. He testified that he never communicated with Altheimer about the Non-Compete Agreement and had all his conversations about the agreement with Mr. Alper. (8/11/00 Levin Deposition, at 106.) It is not clear whether Altheimer knew of the assistance that Mr. Levin provided the Alpers.

[30] See footnote 8.

in part to perform additional due diligence. (3/21/96 Deposition of Timothy Avers, DX 29, at 15-17, 60-65, 102-04.) During the course of these visits, Avers told Macon Brock of DTS about the diverting business that Avers and Freeman operated, and asked Brock why DTS was not pursuing that business. (Avers Dep. of 3/21/96, at 15-17, 60-65.) During one of these conversations, Brock advised Avers that as a prospective purchaser of TPI, DTS was legally obligated to give him 60 days notice after the transaction closed before firing him. (Avers Dep. of 3/21/96, at 57-58.) Over the next several weeks, Avers and Freeman continued to educate DTS representatives about TPI's diverting business and provided DTS with confidential information about the business. (Avers Dep. of 3/21/96, at 15-17, 60-65, 85-86, 102-04.)

After Brock's conversations with Avers and Freeman, DTS persuaded Avers and Freeman to agree to stay with DTS to operate a diverting business after the transaction closed.[31] (Avers Dep. of 3/21/96, at 15-17, 60-65, 102-04, 133-34.) In January 1996, TPI paid Avers an annual salary of approximately $80,000 and paid Freeman an annual salary of approximately $52,000; Avers and Freeman also qualified for a bonus program.[32] (Avers Dep. of 2/29/00, at 42; 7/18/00 Deposition of Raymond Freeman, DX 79, at 70.) DTS offered Avers a salary increase of approximately 50% and the potential for a bonus. (Avers Dep. of 3/21/96, at 133-34.) DTS offered Freeman a salary of approximately $90,000 and the potential for a bonus. (Freeman Dep. of 7/18/00, at 70.) On January 31, 1996, the day the transaction between DTS and TPI closed, Avers falsely assured Batkiewicz that he and Freeman still intended to work for the Alpers and their new company after the transaction closed. (Batkiewicz Dep. of 7/11/00, at 232; Deposition of Timothy Avers of 3/16/00, DX 74, at 273-74.) The following day, February 1, 1996, Avers told Batkiewicz the truth: that he and Freeman had accepted positions with DTS and no longer planned to work for

---

[31]     The record does not indicate who persuaded Avers and Freeman to work for DTS.

[32]     Neither Avers nor Freeman offered any details about the bonus options at TPI or DTS.

the Alpers and their new company and that he had lied to Batkiewicz the day before. (Batkiewicz Dep. of 7/11/00, at 232-33; Avers Dep. of 3/16/00, at 80; Batkiewicz Dep. of 3/29/96, at 202.)

Batkiewicz then asked Avers if he and Freeman would accept counteroffers from the Alpers, and Avers responded that they would. (Batkiewicz Dep. of 7/11/00, at 233; Avers Dep. of 3/16/00, at 274-75, 277.) Avers disclosed DTS's offer of an increase in salary of approximately 50% with a greater bonus potential. (Batkiewicz Dep. of 7/11/00, at 235.) Batkiewicz told Avers to wait around and that he would get back to him by the end of the day with a counteroffer; Avers stayed at the TPI office until 6:30 pm that evening but did not hear from Batkiewicz about a counteroffer. (Avers Dep. of 3/16/00, at 275-76; Batkiewicz Dep. of 7/11/00, at 233-35.) On the same day, Batkiewicz told the Alpers that Avers and Freeman had accepted positions with DTS but were willing to consider counteroffers from the Alpers. (Batkiewicz Dep. of 11/25/96, at 380.) Neither the Alpers, Batkiewicz, nor anyone else acting on behalf of the Alpers ever made a counteroffer to either Avers or Freeman. (M. Alper Dep. of 5/24/00, at 1043; Batkiewicz Dep. of 7/11/00, at 235; P. Alper Dep. of 7/13/00, at 611.)

In his deposition in the state court litigation between the Alpers and DTS, Mr. Alper agreed to the suggestion that the Alpers decided not to make Avers a counteroffer because "Dollar Tree's offer was too rich for [his] blood." (M. Alper Dep. of 3/26/96, at 327-28.) In the current case, Mrs. Alper testified that financial considerations did not play a part in her decision not to make Avers and Freeman a counteroffer. (P. Alper Dep. of 7/13/00, at 623-25.) The Alpers testified in this litigation that they did not make Avers and Freeman a counteroffer because Avers and Freeman lacked integrity, had shared confidential information concerning TPI's diverting business with DTS prior to the closing of the transaction in violation of confidentiality agreements Avers and Freeman had signed in 1993, and had lied about whether they were going to work for the Alpers after the transaction closed. (M. Alper Dep. of 5/24/00, at 1043-44, 1060; P. Alper Dep. of 7/13/00, at 611,

29

623-24.) Specifically, Mrs. Alper testified that a "counteroffer would have been out of the question because . . . of [Avers' and Freeman's] violation of disclosing confidential company information" (P. Alper Dep. of 7/13/00, at 611), and Mr. Alper testified that "[a] person that doesn't keep their word to me I wouldn't want as an employee." (M. Alper Dep. of 5/24/00, at 1043.) Although he does not deny asking Avers to remain in the TPI office on February 1, 1996, waiting for a counteroffer of employment, Batkiewicz nevertheless testified that there was "[n]ot a chance" that he would rehire Avers because Avers "has no integrity." (Batkiewicz Dep. of 7/14/00, at 330.) Batkiewicz acknowledged that Avers' lack of integrity was not the result of any conduct of Altheimer. (Batkiewicz Dep. of 7/14/00, at 330.)

**The Alpers' Post-Transaction Plans**

As noted earlier, the Alpers planned to form a new retail business after the transaction with DTS and formed a corporation for that purpose (the "new TPI") on January 30, 1996 before the DTS transaction closed.[33] (1/30/96 State of Delaware Articles of Incorporation for Terrific Promotions, Inc., DX 61.) They also intended to operate a post-transaction diverting business in the same manner they had run their pre-transaction diverting business, and intended to continue buying from the same vendors and selling to the same buyers. (P. Alper Dep. of 7/13/00, at 788-89; Reynolds Report, at 22-23; Preliminary Expert Report of Plaintiffs' damages expert, Bernard E. Brady ("Brady Rep."), DX 76.) The Alpers contend that they intended to use the profits of the post-transaction diverting business to provide some of the financing for the new business.[34] (P. Alper Dep of 7/13/00, at 664; M. Alper Dep. of 5/24/00, at 1112-1113.) In preparation for beginning the retail business, the Alpers leased new warehouse space and hired more than 20 new

---

[33]     The Alpers suggest that two corporations were formed at this time, but the record before the court includes Articles of Incorporation for only one new entity.

[34]     On the record before it, the court has found no indication that the Alpers informed Altheimer of these intentions.

employees.[35] (P. Alper Dep. of 7/13/00, at 651-54; M. Alper Dep. of 5/24/00, at 1165; Batkiewicz Dep. of 7/11/00, at 260-61.) None of the new employees were hired to work full-time in the diverting business, but Batkiewicz testified that some employees, such as accountants, would have worked on whichever business generated a need for their work. (*Id.*)

In some point in mid-April 1996, about two and a half months after Avers and Freeman told Batkiewicz that they had accepted offers from DTS, the Alpers abandoned their plans for a new retail business. (P. Alper Dep. of 7/13/00, at 672-74, 680-82.) Pamela Alper testified that in making this decision, the Alpers recognized that they could have replaced the allegedly lost diverting revenues through borrowing or investment, but elected not to do so.[36] (*Id.*) The Alpers incurred various costs in shutting down their plans for the retail business, including severance pay of TPI personnel, expenses associated with terminating their warehouse leases, and disposing of unusable inventory. (M. Alper Aff. ¶¶ 18, 22, 23; P. Alper Dep. of 7/13/00, at 643, 649-654; M. Alper Dep. of 5/24/00, at 1176-78.) Mrs. Alper acknowledged that in the absence of any revenues from the diverting business, the Alpers could have borrowed $345,000 to put into their new retail business. (P. Alper Dep. of 7/13/00, at 679-680.) Also available to the Alpers in building their new retail business was the $53 million cash they received on January 31, 1996 in the DTS transaction. (*Id.*, at 678-680; M. Alper Dep. of 3/26/96, at 286.)

**The Aftermath of the Transaction with DTS**

Since the closing, DTS has operated a diverting business with the same employees that formerly ran TPI's diverting business. (M. Alper Aff. ¶ 15; 3/28/00 Deposition of Macon F. Brock, Jr, PX 11, at 139.) In the years following the transaction, DTS's diverting business had the

---

[35]     The witnesses varied in their recollections of how many employees were hired: Mrs. Alper recalled hiring about 30, Mr. Alper recalled that 27 were hired, and Mr. Batkiewicz believed that 23 were hired. (P. Alper Dep. of 7/13/00, at 651-54; M. Alper Dep. of 5/24/00, at 1165; Batkiewicz Dep. of 7/11/00, at 260-61.)

[36]     The record does not indicate the date on which the Alpers made this decision.

following sales figures: for the final 11 months of 1996, $17,033,925; for 1997, $21,860,635; for 1998, $26,052,799; and for 1999, $26,186,939. (DTS Chicago Distribution Income Statement, Exhibit 1 attached to Brady Rep.) The Alpers argue that this constitutes essentially the same diverting business formerly run by TPI, while Altheimer notes that DTS has many more retail stores associated with its diverting operation than TPI ever did. These figures permit some comparison: the court notes that TPI did $9,602,956 in diverting business in the twelve months ending September 30, 1995, while DTS did $17,033,925 in diverting business between February 1 and December 31, 1996. (*Id.*; TPI Financial statements; Batkiewicz Table.)

At an unspecified date shortly after the transaction closed on January 31, 1996, Mr. Alper called Lieberman to tell him about the actions of Avers and DTS. (M. Alper Dep. of 5/24/00, at 1074-76.) Mr. Alper told Lieberman that the Alpers were very upset and asked what they needed to do. (*Id.*, at 1075-76.) On February 12, 1996, Plaintiffs met with Defendant Schlossberg and Altheimer attorney Roger Harris. (M. Alper Aff. ¶ 18; 9/18/97 Deposition of Altheimer Attorney Roger B. Harris, PX 17, at 41.) At this meeting, Defendants did not advise Plaintiffs to seek independent counsel to represent them with regard to Defendants' role in the transaction; nor did either Schlossberg or Harris tell the Alpers that they might have a claim against Defendants themselves for failing to protect the diverting business. (Harris Dep., at 21-62.) Defendants argue that they never saw a conflict of interest between their position and that of the Alpers, and therefore saw no reason to recommend the hiring of independent counsel. (Harris Dep., at 40-42, 47-48.)

During the February 12 meeting, Schlossberg and/or Harris advised the Alpers that nothing in the transaction documents prevented DTS from engaging in the wholesale business or from hiring Avers and Freeman. (Roger B. Harris Memorandum of 2/26/96 re: Michael and Pamela Alper ("Harris Memo"), DXO 69, at 5; P. Alper Dep. of 7/13/00, at 736-37; P. Alper Notes from 2/12/96 Meeting, DXO 68.) The attorneys jointly advised the Alpers that they might nevertheless

32

assert claims against DTS in connection with its conduct in the transaction. (M. Alper Aff. ¶ 18; 9/18/97 Deposition of Altheimer Attorney Roger B. Harris, PX 17, at 41.) Harris observed that the Alpers might have a claim against DTS either for its representation during negotiations that it was not interested in the wholesale business or for causing Avers and Freeman to lie to the Alpers. (Harris Memo, at 5, 9, 10.) Harris warned, however, that these claims were weak and would be difficult to win; he suggested that the "goal" of a lawsuit against DTS would be negotiations that gave the Alpers something for releasing their claims, such as relief from their own agreement not to compete with DTS in the retail business. (*Id.*, at 9, 10.) After the meeting, Harris began drafting a complaint against DTS, including allegations that (a) DTS's representation that it was not interested in the wholesaling business (including wholesale distribution) was a material inducement to the Alpers' entering into the covenant not to compete, and (b) "the parties did agree in the Agreement that Alpers could engage in wholesale business, immed[iately] hire E[mployee]s of wholesale business and retain conf[idential] info[rmation] of wholesale business." (Draft Complaint, PX 40; Harris Dep. at 11-12, 24-25, 77-78.)

On February 20, 1996, Defendant Schlossberg met with the Alpers' new counsel, Robert Cummins of Bickel & Brewer.[37] (Undated Bickel & Brewer Memorandum by MMK, PX 41.)[38] A Bickel & Brewer memorandum summarizing the meeting reported that Defendant Schlossberg agreed with the Alpers' position that "it was clear from the onset of the negotiations to all involved . . . that the Alpers' wholesale merchandising business was not being sold and was not a part of DTS's acquisition of TPI." (*Id.*) Schlossberg also agreed that he had understood that "the

---

[37]    The record does not indicate when the Alpers retained Mr. Cummins or what became of Sidley's representation of the Alpers.

[38]    The author of the Bickel & Brewer memorandum is identified only by the initials MMK. From other documents on the record, the court infers that the memo was prepared by Megyn Kelly, Mr. Cummins' associate. See 2/22/96 Schlossberg Memorandum ("Schlossberg Memo") to Don H. Reuben, Ex. A to Defs.' Resp. to Pls.' Add. Facts, at 1.

Alpers would continue employing key personnel including Tim Avers and Ray Freeman." (*Id.*) When Cummins asked him why Altheimer did not draft the transaction documents to specify that the wholesale merchandising business was not part of the transaction, Schlossberg replied, "We never thought of it," apparently because it was "so clear" to everyone that this existing aspect of the Alpers' business was to be excluded from the transaction. (*Id.*)

Unsurprisingly, the parties interpret this memo differently. Plaintiffs argue that the memo recounts a confession of negligence by Schlossberg (Plaintiffs' 56.1, at 79-80 ("Defendants Admit Negligence")), while Defendants argue that the memo reflects both Schlossberg's understanding that DTS was not interested in the wholesale business and the fact that the Alpers failed to disclose to DTS that their wholesaling business incorporated both traditional wholesaling and wholesale diverting. (Defs.' 56.1 Resp., ¶ 223; Schlossberg Memo, at 1-2; 4/9/96 Deposition of John Megrue, DXO 24, at 76-77; 10/29/97 Deposition of Myron Lieberman, DXO 23, at 34-35.) Put differently, Defendants' argument on this point is that DTS disavowed any interest in TPI's *conventional* wholesaling business, which Defendants allege was the only wholesale-related business that TPI disclosed to DTS.[39] (*Id.*)

On February 28, 1996, Altheimer attorney Edward McNally sent Cummins a letter stating that Altheimer's review indicated that certain documents "provide significant evidence of the possible active fraud of [DTS] vis-a-vis the Alpers and their agents and attorneys who were retained to work on the asset purchase transaction." (2/28/96 Letter from McNally to Cummins, PX 42.) On March 13, 1996, Cummins filed a complaint in Illinois state court on behalf of the Alpers and the new TPI against DTS and Avers, alleging (1) breach of contract by DTS; (2) breach of contract

---

[39]    For clarity's sake, and without drawing inappropriate factual inferences at this procedural posture, the court notes that one implication of Defendants' argument is that explicitly protecting the diverting business would have entailed acknowledging its existence to DTS. It is undisputed that Lieberman knew of TPI's diverting business, but it is not clear to the court what the Altheimer attorneys believed DTS knew or didn't know about TPI's diverting business.

by Avers; (3) fraudulent inducement by both defendants; (4) negligent misrepresentation by both defendants; (5) misappropriation of proprietary information in violation of the Illinois Trade Secrets Act by both defendants; (6) civil conspiracy by both defendants; and (7) unfair competition by both defendants. The complaint sought specific performance from and a declaratory judgment against both defendants. (3/13/96 Verified Complaint ("Ver. Compl."), DX 1.) In the course of this litigation, Defendant Schlossberg testified that he believed that TPI's "wholesale operations" were going to be transferred to DTS along with the stock. (Schlossberg Dep. of 11/14/97, at 316.)[40] Plaintiffs assert that their claims were compromised by this testimony and by Schlossberg's November 6, 1996 deposition testimony (Pls.' 56.1 ¶ 230):

> Q:  Was it your understanding . . . that if Dollar Bill$ was purchased by Dollar Tree, that the Alpers were going to retain and continue the wholesale merchandising business?
>
> A:  It was not my understanding.
>
> Q:  So your understanding would be inconsistent with the allegation in paragraph 26 [of the Alpers' complaint against DTS and Avers]?
>
> A:  That is correct.

(11/6/96 Schlossberg Dep., at 277.) Defendants contend that many of the Alpers' claims rested on the representations made by DTS representatives, not the transaction documents. (Defs.' Resp. to Pls.' Add. Facts ¶ 230.)

**The Alpers' Negotiation and Payment of Altheimer's Fees**

At an unspecified date after the transaction closed on January 31, 1996, Lieberman spoke over the phone with Mr. Alper about Altheimer's fees. (Lieberman Dep. of 10/29/97, at 21-22.)

---

[40]     Although the parties have submitted excerpts from Mr. Schlossberg's deposition testimony on the day in question, the court has been unable to find a copy of the cited page of testimony. Because the parties have agreed to both this citation and the substance of the summarized testimony, and have elsewhere demonstrated their willingness to question both aspects of their adversaries' citations, the court considers this testimony.

During this conversation, Lieberman told Mr. Alper that based on the time put in by the attorneys at their normal hourly rates, the fees for the transaction were about $125,000, and that with additional expenses and the additional post-closing work that would inevitably spring up, he believed a fair fee would be $200,000 plus expenses. (*Id.*) Mr. Alper agreed, and wrote Altheimer a check for $200,000.[41] (M. Alper Dep. of 5/24/00, at 1078-79.) In naming the $200,000 fee figure, Lieberman considered Altheimer's responsibility, the negotiations, what the firm was called upon to do, the time periods involved, and the "validity" that the firm brought to the transaction. (Lieberman Dep. of 10/29/97, at 118-120.)

**Legal and Procedural Background of the DTS Litigation**

As noted earlier, on March 13, 1996, the Alpers filed a verified complaint against DTS and Timothy Avers in the Circuit Court of Cook County, Illinois, alleging ten claims for relief arising from the January 31, 1996 transaction with DTS. (Ver. Compl.) The Alpers filed a first amended verified complaint against the same parties on March 28, 1996. (Amended Ver. Compl.) In the amended complaint, the Alpers alleged that they "reasonably and justifiably relied on the misrepresentations of DTS and Avers in entering into negotiations with DTS and in deciding to conclude the sale of Dollar Bill$ to DTS" (Amended Ver. Compl. ¶ 54), and that "[b]ecause of the fraudulent conduct of DTS and Avers, the Alpers have suffered and continue to suffer irreparably [sic] injury . . . " (*Id.* ¶ 55.) The Alpers asserted that they were entitled to injunctive relief, compensatory damages in excess of $10 million, punitive damages, attorneys' fees, and costs from DTS and Avers. (*Id. passim.*)

Judge John K. Madden of the Cook County Circuit Court presided over the Alpers' state

---

[41]    Defendants' fact statement in opposition to summary judgment asserts that this check was signed on February 12, 1996, but the testimony cited to support this assertion merely mentions the amount of Mr. Alper's payment without specifying the date he made it. (M. Alper Dep. of 5/24/00, at 1078-79.)

court case against DTS and Avers. (Id., at 1.) On April 16, 1996, DTS moved to dismiss the Alpers' first amended verified complaint under 735 ILCS 5/2-615.[42] (4/16/96 Order by Judge John K. Madden ("Madden Order"), DX 4.) Also on April 16, 1996, the Alpers filed a suit against DTS and Avers in this court, raising federal securities and antitrust claims, as well as the same claims previously raised in their state court suit, and raising factual allegations substantially identical to those in the Alpers' state court suit. (4/16/96 Complaint, DX 5.) On the same day, the Alpers filed a motion to voluntarily dismiss their state court action under 735 ILCS 5/2-1009(a). (4/16/96 Plaintiff's Motion for Voluntary Dismissal, DX 3.) Under his discretionary authority pursuant to 735 ILCS 5/2-1009(b), Judge Madden denied that motion and directed the Alpers to respond to DTS's previously-filed motion to dismiss. (Madden Order.)

On June 18, 1996, after DTS had deposed Lieberman, the state court parties presented oral arguments to Judge Madden on Avers' and DTS's pending motions to dismiss. (6/18/96 Transcript of Proceedings in Cook County ("Cook County Trans."), Chancery Division, DX 6.) During oral argument, Judge Madden asked the Alpers' principal attorney, Robert P. Cummins, whether he thought the stock sale agreement "was well drawn." Mr. Cummins responded:

> In terms of the factual underpinnings of this case and the context of these documents collectively, I am not sure that anybody as of January 30 [1996] representing the Alpers, whether it was you, Judge, or Bob Cummins, or Terry Moritz [DTS's lawyer] could have anticipated what was going on behind the scenes and could have drafted a document that would have been bulletproof. Because these folks [DTS and Avers], once they got the Alpers' signature on the paper took advantage of this document to the extent that they not only breached its provisions but then came in with the argument that, hey, its provisions are such that you can't argue with this over what we did. And so it is defective in that sense.

(Cook County Trans., at 62-63.) Mr. Cummins also noted that the agreement was "not as good a job as could have been done," and that there "perhaps should have been . . . closer scrutiny" of the

---

[42]     The record does not include the motions made by Avers and Freeman. The court infers that their Section 615 motions were motions to dismiss the Alpers' state court action for failure to state a claim.

"fraud" that Cummins argued Avers and DTS committed before and after closing. (*Id.* at 60-63.)

On June 28, 1996, Judge Madden entered an order without a written opinion, in which he dismissed three of the Alpers' claims with leave to replead but upheld the sufficiency of the Alpers' claims for fraud, fraudulent inducement, breach of contract on several different theories, civil conspiracy, misappropriation of trade secrets in violation of the Illinois Trade Secrets Act, specific performance, breach of fiduciary duty, unfair competition, and declaratory judgment. (6/28/96 Court Order, DX 7; Amended Ver. Compl.) Less than a month after Judge Madden ruled on DTS's motion to dismiss the state court complaint, the Alpers again moved to voluntarily dismiss their claim under 735 ILCS 5/2-1009(a). (7/25/96 Order, DX 8.) On July 25, 1996, Judge Madden granted the motion, dismissing the case without prejudice. (*Id.*)

During this time, the Alpers' federal case against DTS and Avers continued to move forward. On August 27, 1996, DTS and Avers filed a 12(b)(6) motion to dismiss the Alpers' federal antitrust and securities claims. (*Terrific Promotions, Inc. v. Dollar Tree Stores, Inc.*, 947 F. Supp. 1243 (N.D. Ill. 1996), DX 10, at 1244; Civil Docket for 96 CV 2230, *Terrific Promotions, Inc. v. Dollar Tree Stores, Inc.* ("Civil Docket"), DX 16.) On November 26, 1996, Judge George W. Lindberg of this court dismissed the Alpers' federal claims with prejudice, and declined to exercise supplemental jurisdiction over the Alpers' state law claims. (*Id.* at 1247-49.) Judge Lindberg's opinion included the following language:

> [T]here is nothing on the face of the Stock Purchase Agreement which provides that DTS was forbidden from hiring Avers or from using [TPI's] wholesale business information. As a matter of law, then, the Alpers were not justified in relying on DTS's representations concerning the meaning of the Stock Purchase Agreement because those representations were contradicted by the plain terms of the written agreement. As sophisticated business persons assisted by counsel, the Alpers could not reasonably have assumed that the Stock Purchase Agreement would result in anything other than the sale of the entire corporation . . . . Inasmuch as plaintiffs have therefore failed to demonstrate that any misrepresentations by DTS caused their injury, they have failed to state a viable securities fraud claim . . . .

(*Id.* at 1249.) Judge Lindberg dismissed the Alpers' antitrust claim because they failed to allege

38

an injury to the market. (*Id.* at 1246-47.) Having dismissed the federal claims, Judge Lindberg declined to exercise discretionary supplemental jurisdiction over the Alpers' state law claims. (*Id.* at 1249.) The Alpers moved to reconsider Judge Lindberg's order, but Judge Lindberg denied the motion on December 10, 1996. (*Id.* at 1252.) The court held:

> As a matter of law, a written agreement to sell one hundred percent of the stock in a corporation conveys ownership of the entire corporate entity . . . unless the agreement explicitly excludes some portion of the company from the transaction. [Citation omitted.] Inasmuch as the parties did not exclude the wholesale merchandising operations of TPI-IL from the sale, the plain terms of the Stock Purchase Agreement explicitly and completely contradicted DTS's prior assertions that it would not acquire that portion of the company.

(*Id.*) The Alpers did not appeal from Judge Lindberg's order dismissing the federal case. (Civil Docket.)

Instead, on February 21, 1997, the Alpers filed this lawsuit against Altheimer and the individual Defendants. (2/21/97 Federal Compl.) The Alpers alleged that Defendants defrauded them, violated the Illinois Consumer Fraud and Deceptive Business Practices Act, were professionally negligent, breached their contract, breached their fiduciary duties, and committed malpractice by both conveying the diverting business to DTS even though the Alpers intended to retain it and failing to prevent DTS from hiring Avers after the transaction closed. (1/21/98 First Amended Complaint ("First Amended Complaint"), DX 17.) As described above, the Alpers also allege that because they did not have an income stream from a post-closing diverting business, they were forced to abandon their plans for a new retail business. (M. Alper Aff. ¶¶ 12, 23; P. Alper Dep. of 7/13/00, at 673-74.) The Alpers claim they are entitled to (1) between \$5.95 and \$9.97 million of alleged lost profits from their diverting business; (2) \$1.1 million in alleged damages resulting from the shut down of their effort to develop a new retail business and \$750,000 in losses resulting from the sale of the retail inventory after they abandoned their plans for a new retail business; (3) \$800,000 in legal fees paid (or to be paid) to the law firms of Bickel & Brewer and

Cummins & Cronin in this litigation; (4) $390,000 in legal fees paid to Bickel & Brewer in the Alpers' litigation against DTS; and (5) $200,000 in legal fees paid to Altheimer for handling the $55 million sale transaction.[43] (Brady Rep., at 7-8.)

Meanwhile, in the state court litigation, on November 20, 1996, DTS appealed Judge Madden's order of dismissal, arguing in part that the voluntary dismissal conferred jurisdiction on the Illinois Appellate Court to consider the merits of the order and asking for a reversal of Judge Madden's order holding that the Alpers had stated claims against DTS. (11/20/96 DTS Appellate Brief, DX 9.) On February 19, 1997, the Alpers filed a response to DTS's brief in which they argued that the Appellate Court lacked jurisdiction to consider an appeal from a voluntary dismissal order but also defended Judge Madden's decision on the merits, in part because their "reliance on DTS's misrepresentations was not unreasonable as a matter of law." (2/19/97 Alpers' Appellate Brief, DX 11, at 2-4, 13.) On March 5, 1997, DTS filed a reply brief, apparently arguing that (1) this court's dismissal of the Alpers' federal suit against Avers and Freeman bound the state appellate court and (b) the Alpers had made "judicial admissions" in their federal malpractice suit against Altheimer that warranted reversal of Judge Madden's order of dismissal of their fraudulent inducement claims against Avers and Freeman.[44] (3/19/97 Plaintiffs-Appellees' Appellate Surreply to New Matters Raised by Reply Briefs of Defendants-Appellants ("Alpers' App. Sur."), DX 13, at 1.) On March 19,

---

[43]     The court has derived these figures from the Rule 56.1 statement Defendants filed in support of their summary judgment motion and Plaintiffs' damages expert report. Defendants' Rule 56.1 statement provides monetary figures for each of the five categories listed above. (Defs.' 56.1 ¶ 136.) Plaintiffs' Rule 56 response asserts only that Defendants' factual statement is "incomplete" and that the statement provides a "portion of [Plaintiffs' expert's] damage analysis." Notably, the only figure that Plaintiffs specifically address in their other pleadings is the alleged damages for lost profits. Accordingly, the court has provided the range of lost profits damages sought by Plaintiffs in their submissions. In any event, for the purposes of this summary judgment ruling, none of the court's legal determinations hinge on the particular amounts sought by Plaintiffs.

[44]     Because the record does not include the state court defendants' reply briefs, the court has relied on the summary of the reply briefs provided in the Alpers' surreply. The court summarizes the Alpers' federal suits in greater detail below.

1997, after DTS had deposed both Lieberman and Schlossberg, the Alpers filed a surreply, again arguing that their state law claims against DTS and Avers had merit and that DTS and Avers "fraudulently induced the Dollar Bill$ transaction." (Alpers' App. Sur., at 7.) In response to the state court defendants' "judicial admission" argument, the brief also contended that the Alpers' fraudulent inducement claim in no way contradicted the Alpers' "questioning of their attorneys' performance in drafting the Stock Purchase Agreement." (Id. at 6-7.) In their depositions in this litigation against Altheimer, the Alpers continue to assert that the allegations in their first amended state court complaint are true. (M. Alper Dep. of 5/24/00, at 1095-1100; P. Alper Dep. of 7/13/00, at 758-763.)

On May 9, 1997, Altheimer filed a motion to dismiss the Alpers' federal complaint on the grounds that (1) Judge Lindberg's decision establishes that the Alpers' own failure to read the stock purchase agreement proximately caused their alleged injury, and (2) under the doctrine of judicial estoppel, the Alpers are bound by their assertions that the unlawful and fraudulent conduct of DTS and Avers was an unforeseeable, intervening proximate cause. (Altheimer's Motion to Dismiss of 5/9/97, DX 14.) On July 3, 1997, Judge Charles L. Norgle of this court denied Altheimer's motion to dismiss on the ground that it could not be resolved without considering materials outside of the pleadings. (Minute Order of 7/3/97, 97 CV 1200, Alper v. Altheimer & Gray, DX 15.)

**Damages and Damages Calculations**

The Alpers incurred significant expenses in conjunction with setting up a retail business after the transaction with DTS. (M. Alper Aff. ¶ 23.) As noted, the parties dispute whether these expenses related to the Alpers' efforts to continue their preexisting diverting business or to the effort to establish a new retail business. The Alpers allege that without key personnel such as Avers, they were unable to compete in the diverting business (Id. ¶ 17); Defendants argue that the Alpers could have trained another employee to run the diverting business or hired other people with

experience in such a business. (Defs.' 56.1 Resp. ¶ 238.) The Alpers allege that they incurred at least $1.5 million in damages in "shutting down" their operations (M. Alper Aff. ¶ 23), while Defendants argue that the only connection the Alpers have drawn between the diverting business and the new retail business was their expectation that profits from the diverting business would be available to help finance the new business. (Defendants' Rule 56.1(a) Statement of Material Facts in Support of Their Motion for Summary Judgment ("Defs.' 56.1") ¶ 100.)

The Alpers allege that they fulfilled all of their responsibilities under the contract with Altheimer and paid the firm at least $200,000 in connection with the DTS transaction and the incorporation of the Alpers' new or continuing business. (M. Alper Aff. ¶ 20.) The Alpers further allege that they would not have paid this amount for Altheimer's services had they known (a) that their interests would not be adequately protected by Defendants, (b) that the DTS transaction would not be documented according to their stated intentions, or (c) that Defendants would intentionally draft the transaction documents so as to transfer the Alpers' wholesale manufacturing business to DTS. (M. Alper Aff. ¶ 20.) Plaintiffs allege further that as a direct result of Defendants' encouraging them to pursue claims against DTS and Avers, the Alpers expended more than $250,000 in litigation aimed at recovery of the wholesale merchandising business. (Id. ¶ 22.) The Alpers allege that if they had understood that the transaction documents prepared by Defendants had transferred their interest in their wholesale merchandising to DTS, they would not have proceeded with the transaction or incurred the expenses of forming and setting up the post-closing retail business. (M. Alper Aff. ¶ 24.)

Defendants argue that the Alpers' failure to read the drafts of transaction documents was an intervening proximate cause of the subsequent problems with the DTS transaction. (Defendants' Memorandum in Support of Summary Judgment ("Defs.' SJ Memo"), at 44-47; 9/25/00 Deposition of Plaintiffs' Expert Stephen M. Slavin, DXO 41, at 72-73.) The Defendants

note further that the Alpers retained independent counsel at Bickel & Brewer who advised them regarding potential claims against DTS and Avers. Defendants have also filed a third-party complaint alleging that Bickel & Brewer proximately caused the Alpers' inability to obtain compensation for their alleged injuries from DTS. (Schlossberg Memo; Altheimer's Third Party Complaint of 2/16/99, Exhibit D to Defs.' Resp. to Pls.' Add. Facts.)

In July 2000, the Alpers submitted an expert report on damages prepared for this litigation by Bernard E. Brady, an accountant by training and profession.[45] (Brady Rep., at 1.) Mr. Brady has never operated a diverting business or been involved in such a business. (8/31/00 Deposition of Bernard E. Brady ("Brady Dep."), DX 77, at 29-30.) He acknowledged that in preparing his report, he did not contact any manufacturers to determine whether they would have continued to offer the Alpers divertable consumer packaged goods after the Alpers' sale of all their retail stores. (Id. at 37.) Brady's report offers two different measures of the value of the business which the Alpers lost: the lost profits approach and the market value approach. (Brady Rep.) The lost profits approach attempts to quantify the projected sales and related expenses of the Alpers' diverting business between closing and the present and then discount the expected value of future sales and expenses back to present value. (Id.) Under this approach, Brady's report estimated the lost value of the Alpers' diverting business at $5.95 million. (Id. at 6.)

Brady's alternative valuation method, the market value approach, attempts to determine what value would have been assigned to the diverting business in an arms-length transaction in 1996, the year the DTS transaction closed. (Id., at 5.) Using DTS's "market price" in the first quarter of 1997 and information from DTS's 1996 Form 10-K, Brady calculated DTS's price earnings ratios for the first quarter of 1997. He then divided the earnings of DTS's entire wholesale

---

[45]     Mr. Brady's Export Report is not dated, but the court infers it was completed some time after July 25, 2000, a date Mr. Brady provided in the report itself for one of his preparation activities. (Brady Rep., at 3.)

division by the price earnings ratios he had calculated, and derived a market value for that division of between $11,245,439 and 15,388.496.[46] (*Id.*) To calculate the portion of this value attributable to the Alpers' former diverting business, Brady compared the actual sales of the DTS wholesale business in 1997 with his projections of the Alpers' TPI diverting business 1998 sales.[47] After concluding that the Alpers' former business contributed 49% of DTS's actual wholesale sales, Brady multiplied this percentage by the market value of DTS's entire wholesale business to yield an estimated market value of between $5,460,000 and $7,480,000 for the Alpers' former diverting business. (*Id.*)

Mr. Brady believed that Batkiewicz had made a "very conservative estimate" of first year sales. Relying on that belief, and on the expert report of Robert D. Reynolds (Brady Rep., at 6), Brady estimated that the Alpers's new diverting business would have generated $9,000,000 in sales in the period between February 1996 and January 31, 1997.[48] (Brady Rep., at 6; Brady Dep., at 199.)

Before the transaction with DTS closed on January 31, 1996, TPI owned and operated 136 retail stores. (M. Alper Dep. of 3/26/96, at 56.) As of February 1, 1996, the day after closing the transaction with DTS, the Alpers did not own or operate a single retail store. (M. Alper Dep. of 5/24/00, at 1106.) Mr. Reynolds, the Alpers' expert, stated in his report that in order to have the ability to display merchandise in a particular geographical area after the transaction, the Alpers (1)

---

[46]     Brady's report does not indicate what market he derived DTS's value from.  On the record before it, the court is unaware whether DTS is publicly traded or was sold at some point after the DTS/TPI transaction.

[47]     It is not immediately clear to the court why Brady opted to compare actual sales and projected sales for different calendar years.

[48]     Mr. Brady testified that he believed Batkiewicz had projected a total sales volume of $5 million for the Alpers' diverting business from February to December 1996. (Brady Dep., at 199.) The court notes that Mr. Brady's projection, unlike Batkiewicz's, includes estimated profits for January 1997.

44

"could have" become a wholesaler with its own retail customers; (2) "could have" developed a cooperative advertising program among customers; (3) "could have" developed cooperative deal merchandise programs with other wholesalers; (4) "could have" developed a consignment program with outsider retailers or guaranteed sale of merchandise for a certain portion of display space; or (5) "could have" built or leased its own stores. (Reynolds Rep., at 23.) Reynolds recognized that except for building or leasing retail stores, each of the post-closure activities that Reynolds claimed could have given the Alpers the ability to display merchandise would have been "different" than the Alpers' retail presence before the DTS transaction. (Reynolds Dep. of 8/30/00, at 232.) When asked if the Alpers' post-transaction plans would constitute a "new way of conducting business for TPI," he responded that their plans would be "a new way to do an established business. They were out of the dollar stores. They were going to be doing something else." (*Id.*)

When the transaction with DTS closed on January 31, 1996, the Alpers had not entered into any contracts or leases for retail stores; nor had the Alpers done so by April 15, 1996. (Batkiewicz Dep. of 7/11/00, at 262-63; P. Alper Dep. of 7/13/00, at 667; M. Alper Dep. of 5/24/00, at 1106.) Under the provisions of the DTS transaction documents, the Alpers were forbidden from engaging in any dollar-store-type business for a period of four years after the closing date. (1/31/96 Non-Competition Agreement, DX 63.) Mr. Alper admitted that "because we were selling the retail stores, I wasn't sure, and no one was sure, how the vendors would react to continue to sell TPI product, any amount of product." (M. Alper Dep. of 3/26/96, at 294.) Neither the Alpers, Avers, nor Batkiewicz had any experience running a diverting business without simultaneously operating retail stores. (Batkiewicz Dep., of 7/11/00, at 283; 6/2/00 Deposition of Timothy Avers, DX 75, at 438-39.) Because the Alpers projected that their post-transaction diverting business would bring in reduced revenues, they decided at an unspecified date in January 1996 that after the transaction closed they would no longer be able to employ Julie Stone, who had worked for the TPI diverting

business before the DTS transaction.[49] (Batkiewicz Dep. of 7/14/00, at 431-33.)

The Alpers insist that they could have achieved the same results with their diverting business that DTS did in fact achieve. Defendants vigorously challenge this claim. They emphasize the testimony of representatives of nine of the principal companies with which the diverting business of TPI transacted business. According to those witnesses, (a) the manufacturers did not know TPI was diverting the product sold; (b) diversion of the product was a violation of the manufacturers' corporate policy; (c) the manufacturers would not have sold goods to TPI if they had known that TPI was diverting the product; and (d) the manufacturers would not have sold to TPI at discounts if TPI had no association with retail stores.[50] In response, the Alpers present evidence that manufacturers are willing to sell to wholesalers that do not own retail stores. (Simmons Notes, PX 44, at 630, 632, 633, 636.) Significantly, however, this evidence does not establish that manufacturers would not give wholesalers who lacked any retail presence the discounted prices that make diverting possible.

On November 3, 1995, during the negotiations with DTS and before this litigation,

---

[49]    The record does not indicate what role Julie Stone played in the diverting business, nor is the court aware of her role's importance compared with that of Avers or Freeman.

[50]    Representatives of the following companies have testified: the Andrew Jergens Company, Blistex, Inc., the Dial Corporation, Heinz Pet Products, Hershey Foods, Kraft, Ralcorp Holdings, Inc., and Welch's. See 6/5/00 Deposition of David Skarie, Ralston, DX 44, at 14-15, 47-49, 51-52, 93, 107-09, 111-12; 7/20/00 Deposition of Joseph Campeas, national field sales manager for Blistex, Inc., DX 78, at 7-9, 21, 45; 7/26/00 Deposition of Stuart Strauss, vice president of sales customer business for the Andrew Jergens Company, DX 45, at 7-8, 11, 53; 8/8/00 Deposition of Penny Rothwell, manager of sales operations for Welch's, DX 41, at 7-9, 25, 30; 9/11/00 Deposition of Kenneth Cannarelli, vice president of sales and division manager for Dial, DX 35, at 7-9, 20-21, 30, 44-45; 7/28 Deposition of Donald Pellegrino, vice president of sales for Heinz Pet Products, DX 38, at 9-11, 13-14, 20, 34-35; 7/27/00 Deposition of Thomas Cumpson, vice president of field sales for Hershey Corporation, DX 36, at 6-7, 17-25, 54; 9/18/00 Deposition of Rick Gylling, vice president of customer service and sales operations for Kraft Foods, DX 80, at 7-8, 10-16, 19-20, 28, 30-39, 43-46, 62, 84-85; 9/28/00 Deposition of Scott Richards, vice president of global customer and sales development for Kellogg's, DX 82, at 7-12, 15-24, 28-30, 34-35, 49-50, 54-55.) Because the record does not include a complete transcript of Mr. Skarie's deposition, the court is unable to discern his job title at Ralston.

46

Batkiewicz wrote a memorandum to the Alpers valuing the TPI diverting business at $2 million and the TPI's entire business--including the diverting business--at $54 million. (Batkiewicz Memo of 11/3/95; Batkiewicz Dep. of 7/14/00, at 313-14.) On January 22, 1996, before the DTS transaction closed or any litigation commenced, Batkiewicz prepared a projection of 1996 sales for a diverting business as part of a new retail business he contemplated operating after the transaction closed. (Batkiewicz Dep. of 7/11/00, at 250-52; Batkiewicz projections, DX 65.) Batkiewicz based his projections on the assumption that TPI would begin to operate some retail stores in June 1996 and would operate six retail stores by the end of 1996. (Batkiewicz Dep. of 7/11/00, at 250-51; Batkiewicz projections.) He projected that from March until May 1996, TPI's diverting business would be able to sell only fifty percent of the product it would have been able to sell in February 1996 (which was based on the amount of orders actually placed in January 1996, when the Alpers still owned stores associated with the retail business). (Batkiewicz Dep. of 7/11/00, at 264-65; Batkiewicz projections.) He also projected that from June until December 1996, the monthly diverting business sales would steadily increase, to approximately 83% of what the sales would have been in February 1996.[51] (Batkiewicz Dep. of 7/11/00, at 268-69; Batkiewicz projections.) For 1996, the only year for which he prepared projections, Batkiewicz projected that the Alpers' new retail operation would lose approximately $1.4 million. (Batkiewicz projections.) His projections for the diverting business sales were based solely on his own experience in the diverting business, which began in 1993; he had no experience running a diverting business with zero or six retail stores. (Batkiewicz Dep. of 7/11/00, at 272, 283.) Before preparing his projections, Batkiewicz did not speak to any manufacturers to determine whether they would

---

[51] Batkiewicz's projections for the total distributing sales from February to December 1996 are difficult to determine. Citing the totals column in his projections table, Defendants argue that Batkiewicz projected a total of $5 million. (Defendants' 56 ¶ 155(c).) Plaintiffs argue that this entry reflects a mathematical error and should be $8 million. (Plaintiffs' 56 Response ¶ 155(c).) The court's own calculations--derived from adding the 11 entries that Batkiewicz made for the months of February to December—yield a diverting sales projection of $7.25 million.

continue to sell product to the Alpers even after the Alpers no longer owned any retail stores. (*Id.* at 275-76.) Some time after litigation commenced, Batkiewicz prepared an analysis of the net profits generated by the diverting business during its three years of existence: 1993 ($10,696), 1994 ($391,031), and 1995 ($342,596). (*Id.* at 285-87; Batkiewicz Table.)

The Alpers would have had no retail dollar stores as of February 1, 1996, and could not, consistent with the language of the agreement, have operated any dollar stores before February 1, 2000; DTS, in contrast, had 636 retail dollar stores as of February 1, 1996, 737 stores as of January 1, 1997, 887 stores as of January 1, 1998, 1,156 stores as of January 1, 1999, and 1,383 stores as of January 1, 2000. (Non-Competition Agreement, at 2; 3/30/2000 Deposition of Karen Joyner, DX 81, at 58; DTS 10K Form of 3/25/96, at 3-4, DX 64.)[52] As noted above, the parties dispute whether the number of retail stores associated with a diverting business is a critical factor in the success of such a business.

**Expert Testimony on Professional Standards of Care**

**Stephen Slavin**

The Alpers hired Stephen Slavin to offer an expert opinion concerning the standard of care of lawyers specializing in mergers and acquisitions in Chicago, and whether Altheimer's conduct met that standard of care. (Supplemental Affidavit of Stephen M. Slavin ("Slavin Aff."), DXO 40, at iii-iv.) Slavin is a lawyer who practices transactional law, including mergers and acquisitions, and was the head of the transactional practice group at the Chicago office of the law firm of Foley & Lardner between September 1, 1991 and August 2000. (*Id.*) Slavin asserts that Altheimer breached the standard of care in the following ways: (a) failing to make certain the Alpers fully understood the nature of the transaction documents; (b) failing to ask the Alpers sufficient

---

[52]     The record before the court does not indicate Ms. Joyner's occupation or employer. Plaintiffs have not challenged the experience or qualifications underlying her testimony.

questions about their post-closing plans; (c) failing to get a reciprocal non-compete, non-hire agreement with DTS which would have barred DTS from engaging in the wholesale business or hiring TPI's wholesale business employees; (d) failing to advise the Alpers about how to assure that Avers and Freeman would work for them after the transaction; and (e) failing to call to the Alpers' attention that the transaction documents did not assure that Avers and Freeman would be available to them after the transaction. (*Id.*, at iii-vi.) In arriving at his opinion, Slavin assumed that Altheimer knew that the Alpers wanted to retain the wholesale business and to operate it after closing the DTS transaction. (8/23/00 Preliminary Expert Report of Stephen M. Slavin ("Slavin Report"), DXO 39, at 2; 9/25/00 Deposition of Stephen M. Slavin ("Slavin Dep."), DXO 41, at 91.)

Slavin did not review any of the correspondence about the terms of the transaction which preceded the draft transaction documents, or any of the draft transaction documents. (Slavin Dep., at 67-69; Slavin Report, at i-ii.) Nor did he review the notes taken by participants in the Non-Competition Agreement negotiations, though he acknowledged that the issue of whether Batkiewicz was authorized by the Alpers to negotiate directly with DTS managers on this point might have affected his opinions. (Slavin Dep., at 96-99; Slavin Rep., at i-ii.) Slavin assumed that Batkiewicz was not the Alpers' agent for the transaction, except for limited matters relating to due diligence. (Slavin Dep., at 75-78, 81-85.) In addition, Slavin did not review the testimony or documents relating to Sidley's representation of the Alpers, Levin's advice to the Alpers, or DTS's representatives' understanding of the transaction (other than that of Mason Brock). (*Id.*, at 79-81; Slavin Rep., at i-ii, vii-viii.) Slavin had no information about whether the Alpers had reviewed drafts of the transaction documents, an issue that had the potential to affect some of his opinions. (Slavin Dep., at 101.) Similarly, in rendering his opinion, he could not recall whether Altheimer met with the Alpers to discuss the draft transaction documents—another issue that might have affected his opinion. (*Id.*, at 105.) Finally, Slavin testified that he did not know that Mrs. Alper had told DTS

49

during the negotiations on the Non-Competition Agreement that the employees should be free to choose their employer. (*Id.*, at 134-35.)

### Harold Shapiro

Altheimer retained Harold Shapiro to evaluate whether Altheimer's conduct complied with the applicable standard of care. (Preliminary Expert Report of Harold D. Shapiro ("Shapiro Report"), DXO 37; Affidavit of Harold D. Shapiro ("Shapiro Aff."), DXO 38.) Shapiro has practiced law for 48 years, during which time he has acted as Chairman of the Chicago law firm of Sonnenschein, Nath, & Rosenthal, represented clients in numerous corporate transactions including mergers and acquisitions, and taught as an adjunct professor of law at Northwestern University. (*Id.*) In addition to reviewing many of the materials relied upon by Slavin, Shapiro reviewed Altheimer's billing records from the Alper/DTS transaction; the testimony of Batkiewicz, Levin, and Sigal; and a collection of notes, correspondence, draft transaction documents, and deposition testimony prepared by Altheimer's counsel that reflected the negotiations and drafting of the transaction documents. (*Id.*) Shapiro concluded that lawyers in the position of Altheimer would reasonably have believed that (a) the Alpers and Batkiewicz understood the terms of the Stock Purchase Agreement and the Non-Competition Agreement; (b) asking for additional concessions from DTS would have been fruitless and possibly dangerous to the transaction; and (c) their retention was limited to the sale of TPI to DTS. (Shapiro Report, at 3-4.)

### Warren Lupel

The Alpers hired Warren Lupel to offer an opinion as to whether Altheimer's conduct violated the Illinois Rules of Professional Conduct. (Affidavit of Warren Lupel ("Lupel Aff."), DXO 34 ¶ 4.) Lupel has been a trial attorney in Chicago for more than 30 years, and has worked on numerous matters involving professional responsibility and claims of legal malpractice. (*Id.* ¶ 3.) Lupel has had no involvement in mergers and acquisitions since 1989, and he testified that he

would not have been qualified to represent the Alpers in the transaction if they had approached him either in 1995 or in 2000. (9/22/00 Deposition of Warren Lupel, at 94-95.) In support of their motion for summary judgment, the Alpers offer Lupel's affidavit testimony that Altheimer violated Rules 1.1(a) (competence); 1.2(a) (consulting with the client about the pursuit of objectives); 1.4(a)-(b) (keeping a client reasonably informed and explaining the matter to a client); 1.5(a) (reasonable fee); 1.7(b) (conflict of interest); 2.1 (exercise of independent professional judgment); and 8.4(a)(4) (conduct involving dishonesty, fraud, deceit or misrepresentation). (Lupel Aff. ¶¶ 5-7; Preliminary Expert Report of Warren Lupel ("Lupel Report"), DXO 81, at 3-7.) In preparing his opinion, Lupel did not review any of Batkiewicz's testimony, even though the actions of an agent of the Alpers might be important to Lupel's opinions in the case. (Lupel Dep., at 69-70; Lupel Report, at 2-3.) In addition, Lupel assumed that DTS representatives did not intend to purchase the wholesale diverting operation of TPI. (Lupel Dep., at 71-75.) Moreover, Lupel did not review any of the pre-transaction correspondence in this matter (Lupel Report, at 2-3; Lupel Dep., at 75-78) or any of the transaction documents or draft documents. (Lupel Report, at 2-3; Lupel Dep., at 103) Lupel did not know how it happened that the transaction documents specified that Avers was available to be hired by both sides after the closing. (Lupel Dep., at 138-39.) Nor did he review the testimony or documents relating to Sidley's representation of the Alpers, Levin's advice to the Alpers, or the DTS representatives (other than Macon Brock)'s understanding of the transaction. (*Id.*, at 71-75, 81-88.) Lupel assumed that Lieberman's fee arrangement with the Alpers was based on hours alone. (*Id.*, at 174-75.)

### Robert Burns

Altheimer retained Robert Burns to evaluate the Alpers' contention that Altheimer's conduct violated provisions of the Illinois Rules of Professional Conduct. (Affidavit of Robert P. Burns, DXO 33 ("Burns Aff."), at 1; Preliminary Expert Report of Robert P. Burns ("Burns Report"), DXO 79, at

1.) Mr. Burns is a professor of law at Northwestern University School of Law, where he has taught the law of Professional Responsibility for approximately eight years. (Burns Report, at 1.) In addition to reviewing all of the materials relied upon by Lupel, Burns also reviewed Altheimer's billing records from the Alper/DTS transaction; the testimony of Batkiewicz, Levin, and Sigal, the Sidley partner; and a collection of notes, correspondence, draft transaction documents and deposition testimony prepared by Altheimer's counsel that reflected the course of negotiations and drafting of the transaction documents. (Burns Aff.; Burns Report, at 1-2.) Burns concluded that, "there is a plausible understanding of the actions and judgments of the Altheimer . . . lawyers such that those actions are fully consistent with their professional obligations.[53] (Id.) Specifically, Burns states that if the jury concludes that the Alpers intended to keep DTS "in the dark" about the diverting business and chose not to bargain explicitly about the diverting business or its employees in the expectation that Avers and Freeman would voluntarily come to work for the Alpers after the transaction closed, then Altheimer's conduct is consistent with Rules 1.1(a), 1.2, and 1.4.[54] (Burns Aff.; Burns Report, at 3-5.) He determined that there was "substantial evidence" supporting that understanding of the case. (Burns Report, at 4.)

Burns stated further that even fully crediting the Alpers' version of the events surrounding their fee arrangement with Altheimer, Altheimer's conduct was consistent with Rule 1.5, because the Alpers were free to pay whatever amount they felt was justified under the circumstances. (Burns Aff., Burns Report., at 6-8.) In Burns's view, this provision both provided a basis for the fee

---

[53]     As discussed below, a violation of the Illinois Rules of Professional Conduct does not independently give rise to a private cause of action. Burns's finding a genuine issue of material fact about Altheimer's alleged violation of the Illinois Rules therefore does not preclude the court from addressing Altheimer's motion for summary judgment on the issue of liability.

[54]     In reaching this conclusion, Burns did not address the issue of whether Altheimer knew or should have known about the Alpers' hypothetical decision to keep DTS "in the dark" about TPI's diverting business. Accordingly, his opinion does not reach the issue of whether Altheimer should have warned the Alpers of the potential consequences of failing to disclose their diverting business to DTS.

at or near the beginning of the representation and made it unreasonable to consider the billing arrangement an improper contingency fee contract under the Illinois rules. (*Id.*) Moreover, he noted that there is no general requirement that a fee arrangement be in written form. (*Id.*, at 7.) Burns also opined that there is no evidence that either Harris or Schlossberg reasonably believed there was a conflict between their representation of the Alpers during their February 12, 1996 meeting, and from Mrs. Alpers' notes and testimony, it is undisputed that Harris and Schlossberg disclosed to the Alpers at that meeting that the transaction documents did not prevent DTS from engaging in a wholesale diverting business or from hiring Avers or Freeman. (Burns Aff., Burns Report, at 8-10.) Burns concluded that there was therefore no basis to conclude that Altheimer acted inconsistently with Rules 1.7, 2.1, or 8.4(a)(4). (Burns Aff., Burns Report, at 10.) He also stated that in reaching a contrary opinion, Lupel improperly resolved significant factual disputes in favor of the Alpers without any evidentiary basis for doing so. (Burns Aff., Burns Report., at 2.)

**Altheimer's Motion to Strike**

On July 19, 2000, this court granted the Alpers' motion for an extension of time in which to make expert disclosures, and ordered the Alpers to make their expert disclosures regarding damages under Federal Rule of Civil Procedure 26(a)(2) by July 31, 2000. (Doc. No. 222.) The court set a deadline of September 15, 2000 for Altheimer to disclose its damages experts. (*Id.*) There is no court order or agreement between the parties permitting "rebuttal" expert disclosures. On July 31, 2000, the Alpers disclosed one testifying damages expert, Mr. Brady, and submitted his 8-page report, which, as summarized above, calculated the Alpers' damages under both the lost profits method and market value method.

In his August 31, 2000 deposition, Mr. Brady testified that he believed the lost profits method yields the more appropriate measure of damages in this case:

Answer [Brady]: In other words, if I would have taken the 5,460,000 and 7,480,000 [the results of the market value approach] and placed that on the line labeled 'loss

sustained by Alpers,' I would have come up with a range of approximately 8,580,000 and 10,750,000. And they [the Alpers' lawyers] asked me why I didn't include those numbers in arriving at the total loss sustained by the Alpers. And I told them that after I analyzed it, in this particular instance, I just considered it more appropriate to use a projected income approach rather than a market approach.

Q:     Why is that?

A:     Because I'm looking at the damages in the hands of the Alpers and not necessarily the damage in the hands of, you know, DTS. Okay? It was the Alpers who were damaged. And in this particular instance, they were deprived of the cash flow which would have been generated by this particular line of business. So that is basically the damages that they sustained.
        The other damage calculation or the other calculation which shows the market approach to a wholesale merchant–or this wholesale merchandising business of 5,460 and 7,480 is really a market approach and that doesn't represent the true circumstances in this case here. So I just felt that that was more appropriate for that reason.

Q:     Did you believe, when you prepared your report, that the appropriate measure was the fair market value of the business that had been lost?

A:     No.

Q:     What did you believe the appropriate measure was?

A:     The present cash flow.

(Brady Dep. of 8/31/00, Ex. B to Defendants' Motion to Strike Affidavit of Robert F. Reilly and

Portions of Rebuttal Affidavit of Bernard E. Brady ("Defs.' Strike Motion"), at 111-12.)

Defendants submitted their own expert reports in September. On September 29, 2000,

Altheimer also prepared and filed a motion for summary judgment in their favor on liability or, in the

alternative, partial summary judgment on damages, directed in part to Mr. Brady's opinions on the

valuation of the diverting business. On October 5, 2000, in response to a request from Plaintiffs'

attorney, this court directed in open court that no expert will be permitted to testify to opinions not

disclosed in her or her report. (October 5, 2000 Transcript of Proceedings, Ex. C to Defs.' Strike

Motion, at 18-19.)

On Friday, November 10, 2000, more than three months after the deadline for their expert

disclosures, the Alpers submitted their response to Altheimer's summary judgment motion. Without leave of court, the Alpers included two new affidavits from damages experts: an affidavit from Mr. Brady, which the Alpers characterized as a "rebuttal affidavit," and an affidavit from Robert F. Reilly, whom the Alpers did not previously identify as an expert. (Rebuttal Affidavit of Bernard E. Brady of 11/8/00 ("Brady Rebuttal"), PX 28; Affidavit of Robert F. Reilly of 11/8/00 ("Reilly Aff."), PX 32; Defs.' Strike Motion ¶ 8.) Altheimer concedes that substantial portions of Mr. Brady's affidavit are fairly characterized as rebuttal testimony, in that they defend opinions that he disclosed on July 31, 2000, in light of the report and deposition testimony of Altheimer's damages expert, Craig T. Elson. (Defs.' Strike Motion ¶ 8(a).) Mr. Brady's affidavit also included a new and different damage calculation, however, a valuation of the market value of the diverting business based on the projected discounted cash flow of the business. (Brady Rebuttal ¶¶ 7-20 ("Fair Market Calculation Using Discounted Cash Flow Methodology") and attached Exhibits 2 and 3.) This new theory was not disclosed in Mr. Brady's initial report, was not testified to at his deposition, and does not constitute rebuttal. In his initial report, Mr. Brady's "lost profits" calculations fixed the Alpers' damages at $5.95 million; his rebuttal affidavit valued the business "within the range of $7,710,000 and $9,970,000." (Brady Report; Brady Rebuttal ¶ 20.) In the rebuttal paragraphs challenged by Altheimer, Mr. Brady claims to be using the same "method described by [Altheimer's damages expert] Elson in his deposition . . . as the method upon which he most heavily relies." (Brady Rebuttal ¶ 9.) In fact, Altheimer asserts, Mr. Elson neither suggested that Mr. Brady should have used this method nor criticized his failure to do so. (Defendants' Reply in Support of Motion to Strike Affidavit of Robert F. Reilly and Portions of Bernard E. Brady ("Defs.' Strike Reply"), at 3; Deposition of Craig T. Elson of 10/31/00, Ex. A to Defs.' Strike Reply, at 188-190.)

Mr. Brady's new damages theory is based, in part, upon calculations and opinions contained in an affidavit of Mr. Reilly, whom the Alpers characterize as a "consulting" expert. (Plaintiffs'

Memorandum in Opposition to Defendants' Motion for Summary Judgment, at 37.) Altheimer had not heard of Mr. Reilly before November 10, 2000. (Defs.' Strike Motion ¶ 8(d).) Reilly's affidavit attests that he performed four kinds of valuations of the Alpers' hypothetical diverting business: two varieties of the income method, and two of the market valuation method. (Reilly Aff., at 3.) None of these methods was disclosed before November 10, 2000.

## DISCUSSION

### A.      Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Alexander v. Wisconsin Dep't of Health and Family Servs., 263 F.3d 673, 680 (7th Cir. 2001). A genuine issue of material fact exists "only if there is sufficient evidence for a jury to return a verdict for that party." Alexander, 263 F.3d at 680, citing Baron v. City of Highland Park, 195 F.3d 333, 338 (7th Cir. 1999). When presented with cross-motions for summary judgment, the court considers the motions simultaneously, and draws all reasonable inferences in favor of the party opposing a particular motion. Buttitta v. City of Chicago, 803 F. Supp. 213, 217 (N.D. Ill. 1992), aff'd 9 F.3d 1198 (7th Cir. 1993). This "Janus-like" perspective can result in the denial of both motions if material facts are disputed. Id.

### B.      Malpractice

This controversy hinges on the question of whether Defendants committed professional negligence in their representation of the Alpers in the DTS transaction. Under Illinois law, a party complaining of legal professional negligence or malpractice must show (1) an attorney-client relationship between defendant and plaintiff; (2) a duty arising from that relationship; (3) a breach

of that duty; (4) causation; and (5) actual damages. *Griffin v. Goldenhersh*, 313 Ill.App.3d 398, 404, 752 N.E.2d 1232, 1238 (5th Dist. 2001). The parties do not dispute the first element. Plaintiffs move for summary judgment on the remaining four elements; Defendants move for summary judgment on the elements of causation and damages.

### 1. The Alpers

The Alpers present two theories in support of their motion for summary judgment. First, they argue that Defendants violated the Illinois Rules of Professional Conduct, and in so doing breached their professional duty to the Alpers. Second, the Alpers argue that the Defendants' own admissions about their professional conduct compel judgment against them as a matter of law.

The Alpers' first argument is a non-starter. As Defendants note, there is no private right of action for a violation of the Illinois Rules of Professional Conduct. *Owens v. McDermott, Will & Emery*, 316 Ill.App.3d 340, 353, 736 N.E.2d 145, 157 (1st Dist. 2000) ("The mere fact that an attorney may have violated professional ethics does not, in and of itself, give rise to an action for damages."); *Nagy v. Beckley*, 218 Ill.App.3d 875, 881, 578 N.E.2d 1134, 1138 (1st Dist. 1991). *See also Universal Mfg. Co. v. Gardner, Carton, & Douglas*, 207 F. Supp. 2d 830, 832-33 (N.D. Ill. 2002). The rules of ethics may be relevant to the standard of care in a malpractice suit, but do not establish an independent claim for relief. *Skorek v. Przybylo*, 256 Ill.App.3d 288, 291, 628 N.E.2d 738, 740 (1st Dist. 1993); *Nagy*, 218 Ill.App.3d at 881, 578 N.E.2d at 1138. Plaintiffs cite *Mayol v. Summers, Watson & Kimpel*, 223 Ill.App.3d 794, 810, 585 N.E.2d 1176, 1186 (4th Dist. 1992) for the proposition that violations of the Rules constitute "further grounds" for Defendants' liability, but this citation is inapposite. The *Mayol* court addressed a challenge to a jury instruction providing that jurors could consider a violation of an Illinois Professional Rule "together with all the other facts and circumstances in evidence" in determining whether a defendant was liable. *Id*. In upholding the jury instruction, the court ruled merely that "[j]uries in legal malpractice suits may properly

consider standards of professional ethics pertaining to attorneys," without addressing the question of whether violating such standards constituted a *per se* violation. *Id.*

Moreover, for purposes of this summary judgment motion, the court can not conclude as a matter of law that Defendants violated the applicable rules of professional conduct. Plaintiffs and Defendants have offered conflicting testimony from experts Lupel and Burns on the question of whether Defendants' conduct violated the Illinois Rules. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 27 F. Supp. 2d 1043, 1048 (N.D. Ill. 1998) (denying summary judgment where "the battle of experts" created a genuine issue of material fact); *Grismer v. Upjohn Co.*, No. 92 C 20310, 1995 WL 390053, at *4 (N.D. Ill. June 26, 1995) (same). In the face of this factual uncertainty, the court would deny this portion of Plaintiff's motion even if violating the Illinois rules were enough to constitute tortious conduct.

Plaintiffs' second theory fails on similar grounds. It is Illinois law that the nature of the duty and breach in a legal malpractice claim must generally be established by expert testimony. *Barth v. Reagan*, 190 Ill.App.3d 516, 521, 546 N.E.2d 87, 91 (2d Dist. 1989). There are a few "common knowledge" exceptions to this principle—professional breaches obvious to a layperson much less a lawyer, such as missing an applicable statute of limitations—but none that apply in this case. *Id.*; *House v. Maddox*, 46 Ill.App.3d 68, 73, 360 N.E.2d 580, 584 (1st Dist. 1977). Plaintiff's expert Slavin opined that Altheimer's conduct failed to comply with the applicable standard of care for experienced Chicago attorneys; Defendants' expert Shapiro testified that Altheimer did comply with the applicable standard. This dispute is enough to forestall summary judgment for Plaintiffs. The court notes further that Plaintiff's expert appears to have based his opinion on factual assumptions not justified by the evidence currently before the court. Thus, Slavin testified that his "report is based on the assumption that the [Altheimer] lawyers knew that the Alpers wanted to retain the wholesale business and operate it post-closing." (Slavin Dep. of 9/25/00, at 91.) This assumption

directly contradicts the Altheimer's lawyers' testimony that the Alpers never told them that the Alpers wanted to continue the wholesale business after closing. Accordingly, Slavin's opinion rests on the resolution of a fact material to this controversy, and the court could not rely on it for purposes of summary judgment even in the absence of a countervailing opinion from Defendants' expert. Accordingly, Plaintiff's motion for summary judgment is denied.

### 2.    Altheimer

Altheimer argues that it merits summary judgment on the issue of proximate causation on four grounds: judicial estoppel; issue preclusion; and two different intervening causes. Altheimer asserts in the alternative that it should be granted summary judgment on the issue of damages.

#### a.    Proximate Cause

##### i.    Judicial Estoppel

The doctrine of judicial estoppel forbids a party from obtaining a judicial victory on one ground and then obtaining a victory in a subsequent case on an inconsistent second ground. *Bethesda Lutheran Homes and Servs., Inc. v. Born*, 238 F.3d 853, 857-58 (7th Cir. 2001).[55] The doctrine is a discretionary one designed to protect the courts from manipulation by litigants. *In re Cassidy*, 892 F.3d 637, 641-42 (7th Cir. 1990). Courts will apply judicial estoppel when (1) the later position is clearly inconsistent with the earlier position; (2) the facts at issue are the same in both cases; and (3) the party to be estopped has convinced the first court to adopt its position. *Ogden Martin Sys.*, 179 F.3d at 527.

Altheimer argues that three representations made by the Alpers in their state court

---

[55]    The court notes that federal law governs the application of judicial estoppel in this diversity case. *Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 527 n.1 (7th Cir. 1999). The choice between the federal and Illinois law of judicial estoppel does not appear to change the result in this case, and the Seventh Circuit has specifically observed that the federal and state cases "use consistent approaches." *Kale v. Obuchowski*, 985 F.2d 360, 361 (7th Cir. 1993).

proceedings bar their claims in the current controversy. First, the Alpers alleged that their injuries–the unintended conveyance of the diverting business to DTS and the failure to prevent DTS from hiring Avers and Freeman–resulted from the fraudulent conduct of DTS and Avers. Second, the Alpers alleged before both Judge Madden and the Illinois Appellate Court that they "reasonably and justifiably relied on the misrepresentations of DTS and Avers in entering into negotiations with DTS and in deciding to conclude the sale of TPI to DTS." Finally, the Alpers' former lead counsel, Mr. Cummins, asserted to Judge Madden that no attorney could have drafted a "bulletproof" document for the Alpers in light of "what was going on behind the scenes."

The court concludes that the judicial estoppel doctrine is not applicable in this case because it is not clear as a matter of law that the Alpers ever successfully persuaded a court to accept any of the three statements that Altheimer has highlighted. Altheimer argues that Judge Madden's denial of DTS' and Avers' motion to dismiss the Alpers' state court action constitutes the kind of benefit that triggers judicial estoppel. Yet this ruling constitutes nothing more than a judicial determination that the facts pleaded by Alpers stated a claim cognizable under Illinois law, which is a very different matter than saying that the court was persuaded by the merits of the Alpers' claim. Put differently, Judge Madden's decision was more a matter of acknowledging and recognizing a particular claim than of being *persuaded* by it.[56] The court notes further that the

___

[56]     Altheimer cites five state cases and two federal cases in support of the proposition that Judge Madden's refusal to dismiss their case outright constituted an adoption of the Alpers' position sufficient to trigger judicial estoppel. The cases are distinguishable, however. In four of them, one court had approved a settlement on grounds that one party then explicitly sought to repudiate in a second proceeding. *See Bidani v. Lewis*, 285 Ill.App.3d 545, 552-53, 675 N.E.2d 647, 652 (1st Dist. 1996) (party denying any interest in business for purposes of divorce settlement estopped from seeking share of business's profit in subsequent proceeding); *Department of Transportation v. Coe*, 112 Ill.App.3d 506, 511, 445 N.E.2d 506, 508-09 (4th Dist. 1983) (employee who asserted partial permanent disability for purposes of settlement with employer estopped from arguing he was able to return to former position; *Dailey v. Smith*, 292 Ill.App.3d 22. 28-29, 684 N.E.2d 991, 995-96 (1st Dist. 1997) (party disavowing interest in partnership in initial bankruptcy hearing estopped from pursuing share of profits in subsequent proceeding); *Kale*, 985 F.2d at 361 (party disavowing partial ownership of asset in divorce proceeding estopped from claiming
(continued...)

Alpers tried to voluntarily dismiss their own state court action both before and after Judge Madden's ruling on DTS's and Avers' motions to dismiss. Even if Defendants were correct that the Alpers successfully persuaded Judge Madden of their position, the Alpers' repeated efforts to dismiss their own case strongly suggest that they are not trying to reap the benefits of inconsistent verdicts or to engage in any of the systemic manipulations that judicial estoppel is intended to forestall.

## ii.    Issue Preclusion

Altheimer argues that as a matter of law, a malpractice plaintiff cannot show an alleged drafting error was the proximate cause of injury when (1) the document's meaning is plain, (2) the plaintiff is sophisticated, and (3) the plaintiff has the opportunity to read the document. Altheimer argues that Judge Lindberg's dismissal of the Alpers' federal claims against DTS and Avers established each of these three elements as a matter of law, and that issue preclusion therefore bars the Alpers from further litigating the issue of proximate causation in this case.

The court is not persuaded. First, the precedents that Altheimer cites in support of its legal rule either do not bind this court or are readily distinguishable from the instant case. Thus, for

---

[56](...continued)
ownership in subsequent bankruptcy proceeding). In each of these cases, a court approved a settlement that resolved a dispute in part because the court accepted a party's factual representations; Judge Madden, by way of contrast, was legally obligated to assume the truth of the Alpers' assertions for purposes of the motion to dismiss. Neither his ruling nor that of the Appellate Court resolved any factual dispute between parties, nor did the Alpers or DTS prevail on or resolve any claims between them.

In two other cases, state officials were able to pursue discovery or win the summary suspension of a driver's license in initial proceedings before changing their positions. *People v. Lawlor*, 291 Ill.App.3d 97, 103, 683 N.E.2d 214, 218 (2d Dist. 1997) (police obtaining seizure on the strength of a document they called a "seizure order" were estopped from treating document as search warrant in second proceeding); *People v. Wisbrock*, 223 Ill.App.3d 173, 175, 584 N.E.2d 513, 515 (3d Dist. 1991) (officials who obtained suspension of driver's license on grounds that driver had supposedly refused to take breathalyzer test estopped from using results of test to convict driver). Finally, in one case, a party who persuaded the Seventh Circuit to address a legal issue on appeal was estopped in a subsequent proceeding from arguing that the court should have ignored the issue. *Kale*, 985 F.2d at 361. Neither Defendants nor the court have located a case in which surviving a motion to dismiss in one proceeding constituted a victory sufficient to trigger judicial estoppel in a second.

example, Altheimer's cases interpreting Illinois law all address allegations of fraud in the inducement raised as a defense to performance of a contract. *See Dickinson v. Dickinson*, 305 Ill. 521, 527-28, 137 N.E.2d 468, 470 (1922) (party who had opportunity to read document before signing it could not claim to have relied on misrepresentations that he was signing a receipt and not a contract); *Pierce v. Atchinson, Topeka and Santa Fe Ry.*, 65 F.3d 562, 569 (7th Cir. 1995) ("[f]raudulent inducement is not available as a defense when one had the opportunity to read the contract and by doing so could have discovered the misrepresentation"); *Kolson v. Vembu*, 869 F. Supp. 1315, 1322 (N.D. Ill. 1994) (same).

Altheimer contends without any precedential support that "[s]ince failure to read clear language is a defense to an action for fraud, it follows *a fortiori* that it is a defense to an action for malpractice that involves alleged negligence rather than willful wrongdoing." (Defs.' SJ Memo, at 36.) This argument focuses on the degree of alleged misconduct without paying proper attention to the underlying relationships between parties, however. Unlike the plaintiffs in the cases cited by Altheimer, the Alpers are not seeking to vitiate a contract made between them and a stranger at arms-length. Instead, they seek damages for the alleged negligence of lawyers who clearly owed their client fiduciary duties in shaping transaction documents on their behalf. While it stands to reason that a plaintiff is obliged to read a contract he himself has negotiated with a stranger, it is not apparent to this court and Altheimer has raised no binding precedents for the proposition that as a matter of law a plaintiff must also read a contract that his lawyers have framed on his behalf before suing the lawyers for negligence. Indeed the only relevant Illinois case law that the court has located suggests that there is no such obligation as a matter of law. *See Sutton v. Mytich*, 192 Ill.App.3d 672, 678-79, 555 N.E.2d 93, 97-98 (3d Dist. 1990) ("[w]hether the failure of a client to read a particular document necessarily defeats a malpractice action is dependent upon the particular circumstances").

Altheimer has located cases from other jurisdictions suggesting that when a "document's meaning is plain, obvious, and requires no legal explanation, and the client is well educated, laboring under no disability, and has had the opportunity to read what he signed, no action for professional malpractice based on counsel's alleged misrepresentation of the document will lie." *Berman v. Rubin*, 227 S.E.2d 802, 806 (Ga. App. 1976.) Altheimer also refers this court to *Hudson v. Windholz*, 416 S.E.2d 120, 125 (Ga. App. 1992), a case in which plaintiffs' decision to execute a release after having read it was held to be an intervening event that caused their alleged damages.[57] In light of the undisputed testimony that the Alpers received and signed only the signature pages from the final contract, the court concludes that there are material questions of fact remaining about the extent to which the Alpers had the opportunity to read and respond to the contract. The Alpers have not alleged that the final version of the contract differed from the draft versions; but neither has Altheimer alleged that the final version was identical to the drafts. Altheimer emphasizes that all versions of the agreement provide for the sale of "all of the Shares" of TPI, but the agreement also provides that the sale shall occur "on the terms and conditions set forth below," contractual provisions that Alpers could conceivably have understood or hoped would protect their interests in TPI's diverting business and its core employees.

Even if Altheimer's proposed legal principle governed this case, Judge Lindberg's prior ruling would not have binding issue-preclusive consequences. Issue preclusion or collateral estoppel applies if four elements are satisfied: (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) the determination of the issue must have been

---

[57]    *Berman* and *Hudson* are distinguishable on their facts. In *Berman*, the court specifically noted that the plaintiff had rejected an initial draft of the agreement, had changes made at his request, initialed every page of the agreement, and signed the final page of the document. 227 S.E.2d at 806. In *Hudson*, the malpractice plaintiffs signed a release that was one-and-one-half pages long, and the record clearly indicated that "plaintiffs read the release they executed, understood the legal consequences of the release before signing it, and made a decision to execute the release" so they could pursue legal action against a third party. 416 S.E.2d at 124.

actually litigated; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom issue preclusion is invoked must have been fully represented. *Gentry v. Duckworth*, 65 F.3d 555, 560 (7th Cir. 1995). Because issue preclusion is an affirmative defense, Altheimer has the burden of setting forth facts sufficient to satisfy every element of the defense. *Adair v. Sherman*, 230 F.3d 890, 894 (7th Cir. 2000).

In the court's view, Defendants have not met this burden. Specifically, they argue that Judge Lindberg's holding rested in part on the conclusion that the stock purchase agreement was plain, explicit, and unambiguous—the first element of the rule that Defendants seek to apply in this case. The relevant language of Judge Lindberg's opinion is as follows:

> As a matter of law. . . the Alpers were not justified in relying on DTS's representations concerning the meaning of the Stock Purchase Agreement because those representations were contradicted by the plain terms of the agreement. As sophisticated business persons assisted by counsel, the Alpers could not reasonably have assumed that the Stock Purchase Agreement would result in anything other than the sale of the entire corporation, subject only to the explicit carve-out provisions included in the agreement.

947 F. Supp. at 1249. Although it is a close question, the court does not read this excerpt as an unalloyed statement that the text of the agreement is objectively clear and unambiguous. While Judge Lindberg did refer to the "plain terms" and "explicit carve-out provisions" of the agreement, his opinion also specifically notes the role that counsel played in assisting the Alpers to interpret and make assumptions about the stock purchase agreement. Put differently, the issue resolved by Judge Lindberg—whether the Alpers *with assistance of counsel* reasonably relied on the representations of their adversaries in the face of the written contract—ultimately departs from the issue that Defendants emphasize—whether the written contract was itself so intrinsically clear and unambiguous that Plaintiffs could not have relied on their attorneys' duty of care. For the purposes of this summary judgment motion, Defendants have failed to prove the first required element for issue preclusion.

### iii.   The Alpers' refusal to rehire Avers and Freeman

Altheimer argues further that the Alpers' refusal to rehire Avers and Freeman on February 1, 1996, the day after the DTS transaction closed, was the sole proximate cause of the Alpers' alleged damages.   This argument, proffered without reference to any case law, misconceives the chronology of events, at least on the record currently before the court.   The Alpers have alleged that Altheimer injured them by failing to structure the DTS transaction in a way that kept DTS from assuming the Alpers' diverting business and from hiring the Alpers' valued employees Avers and Freeman.   The alleged breach therefore occurred throughout the negotiations with DTS and became an actual injury at the moment of closing on January 31, 1996, when the signed agreement legally conveyed the diverting business to DTS. With regard to DTS's hiring of Avers and Freeman, the Alpers' alleged injury also occurred at closing, at which time the transaction document first failed to prevent DTS and the Alpers' employees from formalizing an employment relationship they had apparently been discussing for some time. As the Alpers argue, therefore, by the time that Avers informed Batkiewicz that he would be working for DTS's newly acquired diverting business, the Alpers had already begun to suffer their injury.  Any action or inaction by the Alpers after their alleged injury might be relevant to the issues of mitigation or damages, but not to liability and causation.  Accordingly, summary judgment is not warranted on these grounds.

### iv.   The Alpers' failure to question the correspondence or drafts of the transaction documents

Finally, Altheimer argues that the Alpers' failure to question the correspondence or draft documents reflecting the terms of the transaction was an intervening proximate cause of their alleged damages.  Altheimer notes that the Alpers had access to numerous drafts of the stock purchase agreement, all of which provided on their first page that the Alpers would sell all of their shares in TPI.  In addition it is undisputed that the Alpers received numerous summaries of the

proposed transaction as prepared by both DTS and Altheimer. Neither the Alpers nor Batkiewicz ever asked Altheimer how or whether the transaction documents excluded the diverting business from the transaction. Altheimer argues that these facts, when combined with the transactional simplicity of selling all of one's shares in a corporate entity, compel summary judgment against the Alpers. Defendants argue that to rule otherwise would be "to create the potential for malpractice litigation in every contract dispute." *Hudson*, 416 S.E.2d at 124.

The court concludes that material questions of fact remain on this issue. The Alpers have testified that Altheimer failed both to adequately inquire about the Alpers' objectives for the transaction and to explain the ramifications of the documents they helped prepare. It is not yet clear as a matter of law that the transaction documents Altheimer negotiated on the Alpers' behalf can be reconciled with what Altheimer admits it knew: namely, that the Alpers intended to engage in a post-closing diverting business with Avers and Freeman as employees. A jury might reasonably conclude that even on its own version of the facts, Altheimer should have drafted the Non-Compete Agreement to prevent DTS from hiring Avers and Freeman. Moreover, the Alpers' alleged failure to grasp the distinction between a sale of assets and a sale of corporate stock might have been caused or exacerbated by the October 25, 1995 meeting in which Lieberman noted that a Section 338(h)(10) election permits a stock transaction to be treated as a sale of assets for tax purposes.

###### b. Damages

As noted above, the Alpers seek more than $9 million in damages from Altheimer, including (1) $5.9 million of alleged lost profits from their diverting business; (2) $1.1 million in alleged damages resulting from the shut down of their effort to develop a new retail business and $750,000 in losses resulting from the sale of the retail inventory after they abandoned their plans for the new retail business; (3) $800,000 in legal fees paid (or to be paid) to the law firms of Bickel & Brewer

and Cummins & Cronin in this litigation; (4) $390,000 in legal fees paid to Bickel & Brewer in the Alpers' litigation against DTS; and (5) $200,000 in legal fees paid to Altheimer for handling the $55 million sale transaction. Altheimer argues that it is entitled to summary judgment on each of these claims, except for the $200,000 in fees paid to Altheimer.

### i.    Attorneys' fees in this litigation

The Alper seek $800,000 for attorneys' fees both paid and to be paid in this litigation. It is well-settled law, however, that Illinois follows the American Rule requiring each party to bear its own costs of litigation. *Morris B. Chapman & Assocs., Ltd. v. Kitzman*, 193 Ill.2d 560, 572, 739 N.E.2d 1263, 1271 (2000). Under this rule, a successful party in an action can recover attorneys' fees only if fee-shifting is authorized by statute or contract. *W.E. O'Neil Const. Co. v. General Cas. Co. of Ill.*, 321 Ill.App.3d 550, 558, 748 N.E.2d 667, 673 (1st Dist. 2001). No applicable statute or contract governing attorneys' fees applies in this case, and the American Rule therefore bars the Alpers from collecting the $800,000 they seek.

### ii.    Expenses associated with the shut down of the Alpers' post-transaction retail business

The Alpers also seek $1.85 million in expenses associated with the shutting down of their post-transaction retail business: $750,000 in losses resulting from the sale of multi-price point inventory and $1.1 million in expenses associated with severance pay, warehouse lease terminations, and disposition of unusable inventory. Altheimer contends that it was not the proximate cause of the Alpers' decision to abandon their post-transaction retail business and should therefore not have to pay for expenses associated with the retail business.

The court finds Altheimer's argument on this point persuasive. Even assuming the truth of the Alpers' allegations, Altheimer is at most responsible for the loss of the Alpers' diverting business and employees. The Alpers testified that they wished to use the profits from their post-transaction diverting business to finance the retail business. The Alpers themselves conceded,

67

however, that they could have obtained the requisite money for financing from other sources, including commercial lenders and the after-tax portion of the $53 million they received in the transaction with DTS. In denying Defendants' factual statement that "[a]side from the contribution of money, the Alpers did not require a diverting business to operate their new retail business," Plaintiffs cite only a single excerpt from Mrs. Alpers' deposition. (Pls.' 56 ¶ 101.) In the cited excerpt, Mrs. Alper testified that the Alpers' decision not to proceed with the retail business was based on (a) the loss of the diverting business; (b) "the awareness of the litigation [against DTS and Avers] that would be ensuing, and focusing time, energy and resources on that, as well"; and (c) the emotional toll of having lost the diverting business. (P. Alper Dep. of 7/13/00, at 674-76.) The court concludes that on the evidence before it, a reasonable jury could not conclude that Altheimer was the proximate cause of the Alpers' decision to abandon the post-transaction retail business.[56] Accordingly, Altheimer's motion for summary judgment on this point is granted. Altheimer argues in the alternative that the Alpers lack standing to collect damages for TPI's $1.1 million in shut-down expenses. The court is persuaded by this argument as well, for the reasons given below.

### iii. Attorneys Fees in the Alpers' Litigation against DTS and Avers

Altheimer argues that the Alpers lack standing to recover (a) the $390,000 in legal fees that were paid to Bickel & Brewer during the course of the litigation against DTS and Avers, and (b) the $1.1 million in costs associated with the shut-down of the Alpers' post-transaction business

---

[56]     In the alternative, the Alpers attempt to show proximate causation by arguing that if they had understood "that the transaction documents prepared by [Altheimer] would transfer [the Alpers' interests in] the [diverting] business to DTS, they would not have incurred the expenses of forming and setting up [their post-transaction business.]" (Pls. 56.1 ¶ 244; Plaintiffs' Supplemental Brief on the Pending Motions for Summary Judgment and to Strike Expert Affidavits ("Pls.' Supp. SJ"), at 5.) The costs of establishing the post-transaction business and those of subsequently shutting it down are readily distinguishable, however, and as suggested above, the Alpers have not begun to show that the lack of a diverting business compelled the abandonment of their post-transaction retail business.

because they may not sue on behalf of a corporation.

To begin, the court concludes that the Alpers lack standing to collect damages on behalf of the new TPI. The only evidence on point, Brady's expert report on damages, suggests that the costs and legal fees under discussion here were paid by the new TPI and not the Alpers. In an exhibit attached to his report, Brady itemizes "losses incurred in connection with setting up and shutting down" the Alpers' post-transaction business. Notably, all of the relevant entries derive from losses reported on TPI tax returns between 1996 and 1999.[59] (Exhibit 4, Brady Report.) The court notes further that there is Illinois case law supporting the proposition that injuries done to corporations give rise to causes of action for the injured corporation but not its shareholders. *See Cashman v. Coopers & Lybrand*, 251 Ill.App.3d 730, 733, 623 N.E.2d 907, 909 (2d Dist. 1993); *Peter J. Hartmann Co. v. Capital Bank and Trust Co.*, 296 Ill.App.3d 593, 606, 694 N.E.2d 1108, 1118 (1st Dist. 1998). The court is persuaded that the Alpers lack standing to recoup costs that were paid by a different entity.

The Alpers characterize the standing issue as "form over substance" and suggest that the court should, if necessary, grant them leave to add TPI as a plaintiff five years after the filing of the original complaint. (Pls.' Supp. SJ, at 8.) The court declines this off-hand invitation. Without regard to defenses Altheimer might have to claims by TPI,[60] the court is unprepared to assume, as the Alpers do, that no prejudice could flow from such an amendment. In any event, there is no evidence that Altheimer ever agreed to represent TPI itself, in addition to the Alpers.

### iv.  Loss of Diverting Profits and Althelmer's Motion to Strike

---

[59]     The only items not originating from TPI tax returns are: legal fees capitalized through December 31, 1999, an expense the court presumes was corporate and not personal; fees for Altheimer, discussed above; the $750,000 in inventory loss reported on the Alpers' 1996 tax return; and estimated legal fees, discussed above. (Exhibit 4, Brady Report.)

[60]     Altheimer notes that under Illinois law, the statute of limitations for malpractice claims is two years. *See* 735 ILCS 5/13-214.3; *Morris v. Margulis,* 197 Ill.2d 28, 35, 754 N.E.2d 314, 318 (2001).

Before addressing Altheimer's motion for summary judgment on this portion of the Alpers' damages claims, the court must first determine what amount the Alpers seek. Plaintiffs have not clearly specified the amount they seek in lost profits for their diverting business. As noted above, their expert, Mr. Brady, initially estimated their lost profits losses at $5.95 million before submitting a supplemental affidavit opining that the Alpers had lost between $7,710,000 and $9,970,000.

Altheimer has moved to strike the affidavit of Robert F. Reilly as well as portions of the rebuttal affidavit of Mr. Brady. The Federal Rules of Civil Procedure require parties to disclose the identity of expert witnesses and file expert reports, which "shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor." FED.R.CIV.P. 26(a)(2); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 785 (7th Cir. 2000). As an "automatic and mandatory sanction," Rule 37(c)(1) bars a party that fails to disclose its experts and witnesses from using them as evidence at trial or on a motion unless the party can show the violation was "either justified or harmless." *Miksis v. Howard*, 106 F.3d 754, 760 (7th Cir. 1997), *quoting Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996).

The Alpers maintain that the controverted affidavits are permissible testimony, and contend further that the timing of the filings was harmless. Noting that almost two years have passed since the relevant filings and that Altheimer responds to the affidavits on substantive, as well as procedural grounds, the Alpers urge the court to set a new deadline for the disclosure of expert witnesses. In Plaintiffs' words, "[t]here is time for [Altheimer] to take Reilly's deposition, to redepose Brady if they wish, or to seek leave to supplement their own expert's report or add a new expert of their own." (Pls.' Supp. SJ, at 9.)

The court finds these arguments unpersuasive. First, it is clear that the Alpers submitted the controverted affidavits more than 90 days after the court's deadlines which were set by the court after Plaintiffs sought an extension of time in which to make their disclosures. Second,

Plaintiffs have not even attempted to argue that their tardiness was justifiable. Finally, they have not met their burden of showing that the lateness of their filings was harmless. Defendants prepared extensive summary judgment submissions without being informed of Mr. Reilly's testimony, expertise, or even existence. Similarly, Defendants had no notice that after submitting his expert opinion, Mr. Brady would provide another damages estimate applying a method he had not used before and yielding a range of damages 30% to 67% more than his original estimate.

Plaintiffs brush aside these circumstances, but the court finds their arguments on the issue of harm thin at best. To begin, the fact that Defendants have posed substantive responses to Plaintiffs' controverted affidavits--rather than resting their summary judgment motion exclusively on their motion to strike—does not imply that they were not harmed by Plaintiffs' late filing. The fact that Altheimer's attorneys made arguments in the alternative should not be viewed as a waiver of Altheimer's objections. Second, Plaintiffs note the passage of time since Defendants' summary judgment briefs were submitted. But this argument overlooks the fact that Rule 37 contemplates the exclusion of untimely evidence from *motions*, as well as trials. Plaintiffs do not, and cannot, dispute that they submitted their affidavits after the eve of Defendants' summary judgment motion. Moreover, the court notes that Plaintiffs could very easily have bolstered their case without submitting an untimely, unexpected filing. After reading Mr. Elson's report and hearing his deposition, for example, they could have very easily petitioned the court to reopen the deadlines for expert testimony and disclosure before Altheimer went to the trouble and expense of preparing summary judgment briefs on what it reasonably believed was a complete record. The Alpers' current request to set new disclosure deadlines comes five and a half years after this case was brought and two years after the summary judgment motions were filed. It is well past time for this court to address the summary judgment motions on the merits. The court concludes that

Altheimer's motions to strike should be granted.[61] *See Lohnes v. Level 3 Communications, Inc.,* 272 F.3d 49, 59-61 (1st Cir. 2001) (affirming striking of affidavit of expert first disclosed in opposition to summary judgment motion where failure to disclose "deprived [defendant] of the opportunity to depose the proposed expert, challenge his credentials, solicit expert opinions of its own, or conduct expert-related discovery"); *In re Independent Serv. Orgs. Antitrust Litig.,* 114 F.Supp.2d 1070, 1099-1100 (D. Kansas 2000) (excluding expert testimony first disclosed in opposition to summary judgment motion where prejudice could only be cured by allowing defendant to depose new expert, supplement expert reports and submit supplemental brief on summary judgment motion).

Accordingly, in addressing the issue of alleged damages for lost profits, the court will use the $5.95 million estimate that Mr. Brady provided in his initial expert report. Altheimer argues that as a matter of law, the Alpers cannot collect damages for the alleged lost profits because (1) in operating without retail stores, the post-transaction TPI would have been a "new business" and (2) the Alpers have not established their lost profits damages with the requisite "reasonable certainty." Altheimer argues further that any damages the Alpers can collect should be limited because they

---

[61] The Alpers have cited several cases in support of the argument that their late filing in this case was harmless, but all of the cases are distinguishable from the facts of this case. *See Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.,* 240 F.3d 1, 7-11 (1st Cir. 2001) (affirming admission of tardily disclosed expert where expert was disclosed three months before trial, gave testimony substantially similar to that of deceased former expert, and had testified in two related prior trials); *Phelps v. Coy,* 164 F. Supp. 2d 961, 970, 969-71 (S.D. Ohio 2000) (denying motion to strike untimely expert affidavit which departed from original timely affidavit only in listing sources relied on and fleshing out a single substantive paragraph); *Petit v. City of Chicago,* No. 90 C 4984, 1999 WL 66539, at **1-2 (N.D. Ill. Feb. 8, 1999) (denying reconsideration of substitution of expert witness where party received challenged expert's report nearly six months before date scheduled for parties' final pre-trial order); *Bailiff v. Manville Forest Prods. Corp.,* 772 F. Supp. 1578, 1581 (S. D. Miss. 1991) (denying cross-motions to strike inadequately-disclosed expert reports where "[e]ach side was at least arguably made aware of the other's plans regarding the use of expert testimony" and where defendants merited summary judgment on the merits); *Murphy v. Magnolia Elec. Power Ass'n,* 639 F.2d 232, 234-35 (5th Cir. 1981) (in opinion delivered before promulgation of Rule 37 sanctions, reversing trial court's exclusion of undisclosed expert witness on grounds that challenging party knew of expert's identity from parallel suit and rejected offer to exchange expert reports prior to trial).

failed to mitigate their damages by making counteroffers to Avers and Freeman. Plaintiffs argue that (1) the post-transaction diverting business would not have been a new business, and (2) Mr. Brady provided substantial evidence in support of his lost profits analysis estimate of the Alpers' damages.[62]

Illinois law generally bars a new business from obtaining damages for lost profits as a result of a tort. *Hill v. Brown*, 166 Ill.App.3d 867, 875, 520 N.E.2d 1038, 1043 (4th Dist. 1988); *see also Stuart Park Assocs. Ltd P'ship v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995) (applying Illinois law). Lost profits are an appropriate measure of damages, on the other hand, when an established business is interrupted by a tortfeasor's wrongful conduct. *Milex Prods., Inc. v. Alra Labs., Inc.*, 237 Ill.App.3d 177, 191, 603 N.E.2d 1226, 1236 (2d Dist. 1992). For summary judgment purposes, then, the rule applies only if there is no genuine factual dispute that the Alpers' post-transaction diverting business would have been a new business. Drawing all reasonable factual inferences in favor of the Alpers, as it must, the court concludes that factual questions on this point remain in dispute. On one hand, Altheimer emphasizes that the Alpers intended to sell all of the retail stores that had previously been associated with their diverting enterprise. Indeed, the Alpers' own marketing expert testified that their diverting would have been "different" after the transaction than before. On the other hand, "different" is not necessarily "new," and the Alpers' post-transaction plans entailed buying and selling the same products as ever with the skilled Avers and Freeman still in the fold. Even assuming that Altheimer is correct in asserting that a retail presence is a necessary part of the diverting industry, a reasonable jury could conclude that the

---

[62]     The Alpers also argue that Defendants have failed to address Mr. Brady's "market value" analysis, and that this failure independently suffices to create an issue of material fact. Defendants devote little time addressing the market value analysis substantively because they have directed the court to deposition excerpts noted above, in which Mr. Brady asserts that his lost profits analysis more accurately reflects the Alpers' losses than the market value approach. In the absence of other testimony on point, neither the court nor a jury could reasonably rely on a method disavowed by its own proponent. Accordingly, the court weighs Defendants' summary judgment arguments solely against Mr. Brady's lost profits analysis.

Alpers' plans to buy existing retail stores might be enough to maintain a recognizably "old" form of their business.[63]

The more difficult question in this case is whether the Alpers have met their burden of establishing their lost profits with reasonable certainty. *See Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill.2d 325, 361, 770 N.E.2d 177, 199 (2002); *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 316, 515 N.E.2d 61, 66 (1987). Defendants raise several forceful arguments questioning the certainty of the Alpers' evidence. To begin, there are real questions about how to assess the profitability of a diverting business that has either a non-existent or a very limited retail presence. Plaintiffs have conceded that the Alpers, Batkiewicz, Avers, and the Alpers' damages expert Mr. Brady had no experience in this kind of business. Mr. Alper himself expressed concern that no one knew whether manufacturers would sell to a company with the new TPI's structure, and Defendants have presented considerable evidence suggesting that manufacturers would not have given the new TPI the discounted prices on goods that make diverting possible.

---

[63]    Altheimer's cases on point--*Stuart Park; Alexander Binzel Corp. v. Nu-Tecsys Corp.*, No. 91 C 2092, 2000 WL 310304 (N.D. Ill. March 24, 2000); and *Kinesoft Dev. Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869 (N.D. Ill. 2001), are distinguishable on their facts. In *Stuart Park*, two real estate partnerships sought to collect the profits they lost from an unbuilt apartment complex on "a barren piece of undeveloped land." 51 F.3d at 1328. In affirming a verdict against the partnerships, the Seventh Circuit noted that the partnership's successes with other apartment buildings was irrelevant because they were "different pieces of real estate from different markets," and provided no useful basis for comparison. *Id.* Put differently, the partnerships were selling different products in a different market than before. In *Binzel*, this court overturned a jury's verdict in part because it awarded lost profits to a company that had only been in its chosen market for seven months and projected its future growth on the past performance of a completely unrelated corporation. 2000 WL 310304, at *13. Finally, in *Kinesoft*, the court held that the new business rule applied to a corporation that sought lost profits after having been in existence for five years without ever recording a sale or profit. 139 F. Supp. 2d at 909-911.

As summarized by the Alpers, the post-transaction TPI would have entered the same diverting market as its predecessor, under the same ownership and with most of the same personnel. There is also no question that there was a clearly established market for the consumer goods the new TPI sought to divert. *See also BEM I, L.L.C. v. Anthropologie, Inc.*, 301 F.3d 548, 555 (7th Cir. 2002) (noting that new business doctrine is "hoary principle" with "vague" . . . "outer limits" and with purpose of "limit[ing] the speculative element in estimating lost profits").

More specifically, the estimates and projections that Plaintiffs rely on to support their damages estimates are questionable at best. Thus, for example, in projecting the new TPI's post-transaction diverting business, Batkiewicz was required to make estimates about an enterprise that the Alpers were proposing to change in scope and kind. As noted above, after the DTS transaction, the new TPI would have been (a) contractually barred from owning dollar stores like the ones it had sold to DTS and (b) forced to adapt to owning somewhere between zero and six stores, after having owned 136. Plaintiff's marketing expert, Mr. Reynolds, opined that the Alpers' post-transaction business plan was "sound," but provided no specific estimates or quantitative analysis that could support an award of damages. The Alpers also point to the actual diverting profits enjoyed by DTS as evidence of their own lost profits, but DTS owned between 600 and 1,000 retail stores during the period in question. This retail presence was considerably larger than that of either the old or new TPI, and at least permits the inference that DTS's diverting is not truly comparable to either the past or prospective diverting businesses run by TPI. The court concludes that the Alpers survive summary judgment on this issue by the thinnest of margins. Mr. Brady's accounting qualifications are uncontroverted, and the court will not indulge in weighing or assessing the strength of his opinions at this stage of the proceedings.

Finally, the court turns to the issue of mitigation. As Altheimer correctly notes, Illinois law imposes a general duty upon parties suffering a breach of contract or tort to make a reasonable effort to mitigate avoidable damages. *Maere v. Churchill*, 116 Ill.App.3d 939, 947, 452 N.E.2d 694, 700 (3d Dist. 1983); *Culligan Rock River Water Conditioning Co. v. Gearhart*, 111 Ill.App.3d 254, 258, 443 N.E.2d 1065, 1068 (2d Dist. 1982). Citing this principle and the undisputed fact that the Alpers decided not to make counteroffers to Avers and Freeman, their core diverting employees, Altheimer argues that the Alpers' total damages in this case must be limited to the amount that it would have taken to hire their employees back from DTS. As the Illinois courts have noted,

however, whether a party's mitigation efforts were reasonable is a question of fact. *Corlett v. Caserta*, 204 Ill.App.3d 403, 415, 562 N.E.2d 257, 264 (1st Dist. 1990). Simply put, a jury could reasonably conclude that the Alpers acted reasonably in not attempting to rehire employees that they believed had defrauded them.[64] The court notes further that the Alpers filed suit against DTS and Avers approximately six weeks after the TPI-DTS transaction closed and at which time the Alpers had not yet incurred any of the damages they seek in this action. If the Alpers had prevailed in that suit, they might well have prevented any significant harm from occurring.[65] In sum, the evidence on the record does not necessitate a finding as a matter of law that the Alpers failed to mitigate their damages. Accordingly, Alper's motion for summary judgment on this ground is denied.

---

[64] Of course, a jury might also want to consider the possibility that the Alpers could have hired and trained employees to replace Avers and Freeman and breached their duty to mitigate in failing to do so. Altheimer raises this argument in passing but has not put relevant evidence on the record for the court to consider.

[65] Altheimer is well aware that there may be a connection between the Alpers' unsuccessful state court litigation and the damages they have subsequently claimed. Altheimer's third-party complaint against Bickel & Brewer, a matter that the court need not reach here, hinges on the Alpers' voluntary dismissal of their state court lawsuit.

## CONCLUSION

For the reasons given above, Defendants' motions to strike (Doc. Nos. 281-1 and 281-2) are granted. Defendants' motion for summary judgment (Doc. No. 243-1) is denied with regard to liability and to damages for lost profits, but granted with regard to attorneys' fees in this controversy, damages from the shut down of the Alpers' diverting business, losses from the sale of retail inventory, and attorneys' fees in the Alpers' state court action against DTS and Avers. It is the court's understanding that Altheimer intends to return the $200,000 it collected from the Alpers when this litigation is concluded. Finally, Plaintiffs' motion for summary judgment (Doc. No. 59-1) is denied.

ENTER:

Dated: September 26, 2002

REBECCA R. PALLMEYER
United States District Judge